[Civ. No. 21900. First Dist., Div. Two. Feb. 15, 1965.]

JOHN D. PFAFF, Plaintiff and Respondent, v. FAIR-HIPSLEY, INC., et al., Defendants and Appellants.

276

Angell, Adams, Gochnauer, Elder & Holmes and Samuel L. Holmes for Defendants and Appellants.

Spurr & Brunner and W. H. Brunner for Plaintiff and Respondent.

AGEE, J.—Action for damages for breach of an "Agreement For Cutting And Removal Of Merchantable Timber," dated August 17, 1960, executed by plaintiff and defendant Navarro River Mill, Inc., a corporation, allegedly acting as agent for defendant Fair-Hipsley, Inc., a corporation. Both corporations appeal from the money judgment rendered against them following a nonjury trial.

Under the second count of the complaint, plaintiff recovered $818.01 as the balance due for logs delivered up to October 30, 1961, when the season's operations were shut down because of rain. No issue is raised as to this item.

The appeal is directed to the first count, under which plaintiff recovered $14,973.37 as damages for loss of anticipated profits on logs remaining to be harvested under the contract. The trial court held that defendants wrongfully terminated the agreement as of January 30, 1962, and thereby prevented plaintiff from continuing with his performance of the agreement. The facts will be stated in the light most favorable to plaintiff and all conflicts in the evidence will be resolved in his favor.

The issues are (1) whether there was a failure of performance by plaintiff which warranted termination of the agreement, (2) whether Navarro acted as the agent of Fair-Hipsley in executing said agreement, and (3) whether the damages were properly computed.

*Failure of performance.* ▮▮▮ The agreement of August 17, 1960 required plaintiff to log and deliver to the sawmill "only merchantable Douglas Fir and White Fir and Redwood Timber" from "[s]uch trees as shall exceed eight (8″) inch top in a thirty-two (32′) foot log."

The agreement also provided that plaintiff was required "to conform" to the provisions of an agreement, dated August 31, 1959, between the owner of the land to be logged (Sagart) and defendant Fair-Hipsley, "where conformation pertains to the Logger's operation."

Although reciting that the Sagart agreement "is attached [to] . . . this Logging Agreement," this was not the fact. Plaintiff never received a copy of the Sagart agreement and he was merely shown portions of it on one occasion.

However, the provisions in the Sagart agreement upon which defendants mainly rely to sustain their contention that plaintiff materially breached his agreement are that Fair-Hipsley was required to log clean, i.e., take out all of the merchantable timber, whether standing or on the ground, and not do any "skip or select logging," i.e., the taking of only the most profitable logs. Plaintiff testified that he fully understood that he was so obligated and that he did comply with both of these requirements.

Although plaintiff's agreement contained no time provisions, the master contract between Sagart and Fair-Hipsley provided that it would terminate on December 31, 1963.

Starting in August 1960, plaintiff logged the area known as "Ray Gulch." He built five landings, where the logs were gathered and loaded. All of these landings except number 5 were cleaned up in 1960. Work had not been finished at number 5 in that year and it was not cleaned up until 1961.

In 1961, plaintiff built five landings in "Barton Gulch" and logged there until October 30, 1961, when the rains prevented further work. Landings numbered 6 and 10 had been cleaned up; landing number 7 had been cleaned up except for some standing timber that would have to be hauled out another way; the crew was working at landings 8 and 9 and approximately 40,000 to 50,000 board feet of logs were down, waiting to be harvested, when the rains came; plaintiff intended to resume work at landings 7, 8 and 9 when he returned in 1962.

In November 1961, plaintiff telephoned Merton O. Hipsley, president of both defendant corporations, and asked him for a check for the last half of October 1961. Hipsley told plaintiff that if he "would agree to turn over the contract— . . . [r]elease the contract, that he would hold out a deposit out of the check for the fence and then he would release the balance." Plaintiff refused to release his contract and he never got the check. (This is the item of $818.01 which is not in dispute on appeal.)

As to the second of the two requirements under discussion, both plaintiff and his partner, Gurney, denied that they had done any "skip or select logging." Both were experienced loggers and both testified that, in the areas worked, they took all merchantable timber as defined in the agreement. In this respect, the Navarro River Mill manager testified that it was a matter of the judgment of the estimator as to whether the diameter of a tree exceeded 8 inches at a height of 32 feet above the ground. As Gurney testified, "It is pretty hard

to look up thirty-two feet and see if it is six inches or ten inches.''

We thus have a conflict in the evidence as to whether plaintiff did or did not comply with the two requirements discussed above, which conflict was resolved by the trial court in favor of plaintiff.

Defendants' only other claim of material breach by plaintiff is that he did not remove snags. There is no mention of snags in either agreement and the subject was never discussed with plaintiff. Neither is the subject mentioned in the pleadings or in the pretrial proceedings. However, Fair-Hipsley bound itself in the Sagart agreement to conform to all local, state and federal regulations. The California Administrative Code[1] defines a ''Snag'' as a ''standing dead tree or section thereof'' and requires that ''All snags over twenty (20) feet in height in the logging areas shall be felled concurrently with the felling of timber . . . .''

Regardless of whose obligation it was to fell snags, plaintiff's partner, Gurney, testified that he did not recall any snags being left standing except '' one tree that you could call a snag.'' We think that the rule of ''de minimis'' is applicable here. (Civ. Code, § 3533.)

Appellants herein have made a vigorous attempt to retry the issue of whether respondent performed his agreement up to the time he was prevented by appellants from continuing with such performance. It is apparently necessary to remind appellants that '' 'where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' '' (*Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367, 370 [210 P.2d 757].)

We have concluded that there is substantial evidence to support the trial court's finding that plaintiff performed his part of the agreement until it was terminated and canceled on January 30, 1962.

*Agency.* Fair-Hipsley contends that agency was neither pleaded nor proved and that the trial court erred in not making a more specific finding as to agency.

The complaint alleges that ''On or about August 17,

---

[1]Title 14, division 2, chapter 2, sections 912.11 and 915.1.

1960, . . . plaintiff and defendants[2] [Fair-Hipsley and Navarro] entered into an agreement in writing wherein and whereby plaintiff agreed to furnish to defendants, logging services and logging timber belonging to defendants or which they had the right to harvest, . . . as more fully appears from a copy of said contract attached hereto as Exhibit 'A'. . . .''

Defendants did not demur to the complaint. In their joint answer they denied that Fair-Hipsley had executed the agreement. The trial court made a general finding that the above quoted allegations in the complaint were true.

The attached exhibit made it clear that Fair-Hipsley was not named therein as one of the contracting parties and that plaintiff's theory, therefore, was necessarily that Navarro had executed the agreement *for and on behalf* of Fair-Hipsley.

█ The cause of action against Fair-Hipsley was properly pleaded. ''The plaintiff need only allege the ultimate fact of the making of the contract by the defendant and himself. At the trial it may be proved as evidence of this ultimate fact that an authorized agent acted on behalf of the defendant, without the necessity of alleging the fact of agency or the agent's authority.'' (2 Witkin, Cal. Procedure, Pleading, § 255, p. 1231.)

█ The general finding that Fair-Hipsley had executed the agreement was likewise proper. The court in *Hahn* v. *Hahn*, 123 Cal.App.2d 97, 102 [266 P.2d 519], stated: ''Defendant says the court erred in failing to make a finding as to the agency of Young to act for her. There was no error. The ultimate facts, that defendant and Young purchased the property and defendant executed the note and deed of trust, were found. The fact of agency is evidentiary. It need not be pleaded nor found. [Citations.] It is implicit in the findings made that Young was the agent of defendant. Under such circumstances an express finding of agency was unnecessary.''

█ Defendants did not make any request to the trial court for a specific finding on the issue of agency. (Code Civ. Proc., § 634.) The only request made by defendants on this subject was that the court find that ''Plaintiff's contract was with Navarro River Mill, Inc., only'' and that ''Fair-Hipsley, Inc., was not a party to said contract . . . .''

We have already pointed out that the trial court found the ultimate fact to be exactly the opposite of that requested by defendants. Even if we assume that the wording used by

---

[2]There were no other defendants.

defendants amounted to a request for a more specific finding on the issue of agency, it was not error for the court to deny the request. (*Hahn* v. *Hahn, supra.*) "The 1959 amendments [to section 634 of the Code of Civil Procedure] did not change the basic rule as to the form and content of findings. The trial court still is required to find only the ultimate facts, and findings upon merely evidentiary facts are unnecessary, and if made are surplusage." (*Wishart* v. *Claudio,* 207 Cal.App.2d 151, 153 [24 Cal.Rptr. 398].)

 Defendants incorrectly imply that plaintiff has adopted the agency theory for the first time on appeal. In opposing Fair-Hipsley's motion for a nonsuit, plaintiff's counsel stated to the trial court at the end of his discussion of the evidence: "Now, I think there is a strong inference there that it does establish that Navarro River Mill was the *agent* of Fair-Hipsley, and we have alleged in the complaint these acts were done by both of the corporations, and I think this establishes the inference, particularly in view of the fact that the timber was the timber belonging to Fair-Hipsley." (Italics added.)

 We turn now to the evidence supporting the trial court's implied finding that Navarro executed the agreement with plaintiff as an agent for an undisclosed principal, Fair-Hipsley.

At the time of the execution of his agreement with Navarro, plaintiff had no reason to question whether Navarro was acting as a principal or as an agent. In the light of later events, however, the probability that Navarro had acted as Fair-Hipsley's agent became apparent. He therefore charged in his complaint that *both* had executed the agreement of August 17, 1960.

The record is undisputed that the agreement of August 31, 1959, between Fair-Hipsley and Sagart, gave Fair-Hipsley the exclusive right to log the Sagart property. Merton O. Hipsley, the president of both corporations, testified as follows: "Q. The timber that is being cut there on the Sagart property belongs to Fair-Hipsley? A. Yes. Q. And the Navarro River Mill has no ownership in the timber? A. No."

Fair-Hipsley does not and could not question its knowledge of the agreement with plaintiff or the authority of Navarro to execute it. It was prepared in Hipsley's offices. As Navarro's resident manager testified, "Mr. Hipsley took the mill over" in May 1958. The same personnel kept the books for both corporations; 70 per cent of the sawmill's output was sold by Fair-Hipsley and the remaining 30 per cent was sold by Fair, who is also an officer of both corporations.

Plaintiff's agreement was formally canceled by a letter dated January 30, 1962, and written on the stationery of "Fair-Hipsley, Inc." The letter closes as follows: "We regret that this action has been necessary but your failure to perform your agreement has compelled us to cancel it and to make other arrangements to have logging done. Very truly yours, FAIR-HIPSLEY, INC." Below this is the signature of "M. O. Hipsley," underneath which is typed, "M. O. Hipsley, President."

All of the foregoing evidence was before the court as a part of plaintiff's case in chief. In proceeding with their defense, defendants made no attempt to refute or rebut this evidence. Although Hipsley himself and Austin, Navarro's resident manager, testified on behalf of defendants, neither gave any testimony relating to this issue.

We hold that there is substantial evidence to support the trial court's implied finding that the agreement of August 17, 1960 was executed by Fair-Hipsley, acting through Navarro as its agent.

*Damages.* The trial court found on competent evidence that on January 30, 1962, when plaintiff's agreement was canceled, there remained standing 1,302,033 board feet of timber which plaintiff had a right to log under his agreement.

Under the agreement plaintiff was to be paid $22 per thousand board feet upon delivery to the sawmill.

Plaintiff testified that he and his partner, Gurney, did all of the scaling, the skidding or "yarding," and the loading of the logs themselves; that they hired fallers and buckers at $3 per thousand, a choker setter for $1 per thousand, and truckers at $5 per thousand; that fuel, repairs and replacement of parts on equipment ran $1 per thousand and workmen's compensation insurance was estimated at 50 cents per thousand, making a total of $10.50 out-of-pocket expenses per thousand.

The court deducted only these items of operating costs and awarded plaintiff a recovery of $11.50 per thousand, or a total of $14,973.37.

The equipment used by plaintiff and his partner consisted of a caterpillar tractor, which the partner operated, and a boom loader, which plaintiff operated.

In determining the amount to be awarded to plaintiff, the trial court failed to take into account the value to plaintiff and his partner of being able to remove this equipment and to accept employment elsewhere during the period that they

would have been occupied on the Sagart property if their agreement had not been canceled.

Plaintiff testified that when the agreement was canceled, "I went out and found me another job" and worked all season. Using the caterpillar only on the new job, plaintiff was paid $5 per thousand.

The situation here is comparable to that in *Landon* v. *Hill,* 136 Cal.App. 560 [29 P.2d 281]. There the plaintiff recovered damages for wrongful eviction from a bakery which he had leased. Defendant (lessor) complained that "the court in computing the expenses of operating the bakery from which to determine the net [anticipated] profits [to be] realized, did not deduct anything by the way of salary to Landon [plaintiff] himself, although he was the baker and carried on the business principally through his own efforts." (P. 568.)

The appellate court stated that, "It seems apparent that this was error." It held that, while defendant had the burden of proving mitigation of damages, the evidence was undisputed that plaintiff was offered continued employment at the bakery at $20 per week. It was therefore ordered that the judgment should be reduced "at the rate of $20 per week for the period of the lease from the date of eviction to the date of expiration." (P. 569.)

Both sides cite a number of out-of-state cases on the point under discussion. Actually, it would appear that they are in substantial agreement. We see nothing in two Missouri cases, cited and relied upon by *plaintiff,* which is contrary to the law of this state with respect to the factual situation presented herein.

In *Clark* v. *Smalley Tie & Timber Co.* (Mo. App. 1915) 180 S.W. 435, plaintiffs contracted to cut ties from timber owned by defendant. Defendant repudiated the contract. A judgment in favor of plaintiffs for damages for breach of the contract was reversed on appeal because the trial court had not deducted the cost of performance from the total contract price.

In doing so, the appellate court stated: "So far as the work involved in delivering the ties could be performed by plaintiffs personally, or without expense to them, nothing should be deducted *unless it be shown that plaintiffs did or could have earned something at similar employment during the same period.*" (Italics ours.)

The other Missouri case cited by plaintiff is *Coonis* v. *City of Springfield* (Mo. 1958) 319 S.W.2d 523. There the court

stated: "With respect to the loss of reasonable compensation for services to be performed by plaintiff in the completion of the contract, the burden was upon defendants to show in mitigation of damages *that plaintiffs did earn or reasonably could have earned wages pending the expiration of the contract.*" (Italics ours.)

Plaintiff does not question that the trial court failed to deduct anything for the value of his time and that of his partner, Gurney. In contending that this was not error, plaintiff cites the *dissenting* opinion of Justice Fahy in *Partridge* v. *Norair Engineering Corp.* (1962) 301 F.2d 247.

Justice Fahy stated, at page 253: "A failure to deduct the value of his time would therefore give plaintiff a double recovery. . . . But *if*, as the evidence in this case shows, *Partridge was not able to earn other compensation by utilizing the time he would have spent supervising performance of the contract,* there would be no double recovery should Norair be required to compensate for the loss brought about by its unlawful termination of the contract." (Italics ours.)

We hold that the undisputed evidence herein requires a reduction in the amount of the recovery awarded under the first count of the complaint.

We cannot ourselves determine the amount of such reduction, as the court did in *Landon* v. *Hill, supra,* because of the conflicts and inconsistencies in the evidence pertaining to this issue. This is the function of the trial court. However, a retrial is to be limited to a determination of this question. The finding by the trial court as to the amount of the out-of-pocket operating expenses is based upon substantial evidence and is not to be retried.

Since the judgment herein is being set aside for a retrial of the issue of damages, the lower court should entertain a motion[3] by defendants that plaintiff be required to elect against which of the two defendants the judgment is to be rendered. If such motion is made, judgment cannot be rendered against both the principal and the agent under the facts of the instant case. (*Klinger* v. *Modesto Fruit Co., Inc.,* 107 Cal.App. 97, 103 [290 P. 127]; 1 Witkin, Summary of Cal. Law, Action Against Principal and Agent: Election, § 63, pp. 436-437.)

Judgment as to second count affirmed; judgment as to first

[3]It is unnecessary to determine whether Fair-Hipsley's motion for nonsuit should be deemed to be such a motion. (See *J. M. Wildman, Inc.* v. *Stults,* 176 Cal.App.2d 670, 675-676 [1 Cal.Rptr. 651].)

count reversed as to the issue of damages only, and the trial court is directed to determine the net amount thereof and to take such other proceedings as are in accord with the views expressed in this opinion. Each party to bear own costs.

Shoemaker, P. J., and Taylor, J., concurred.