Seymour T. PARTRIDGE et al.,
Appellants,

v.

NORAIR ENGINEERING CORPORA-
TION, a corporation, Appellee.

NORAIR ENGINEERING CORPORA-
TION, a corporation, Appellant,

v.

Seymour T. PARTRIDGE et al.,
Appellees.

Nos. 16400, 16416.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 10, 1961.

Decided Feb. 23, 1962.

Petition for Rehearing En Banc Denied
En Banc March 19, 1962.

Mr. Mark P. Friedlander, Washington, D. C., with whom Messrs. Mark P. Friedlander, Jr., and Blaine P. Friedlander, Washington, D. C., were on the brief, for appellants in No. 16,400 and appellees in No. 16,416.

Mr. Kahl K. Spriggs, Washington, D. C., with whom Mr. John F. Myers, Washington, D. C., was on the brief, for appellee in No. 16,400 and appellant in No. 16,-416.

Before WILBUR K. MILLER, Chief Judge, and FAHY and BASTIAN, Circuit Judges.

WILBUR K. MILLER, Chief Judge.

Norair Engineering Corporation, general contractor for the construction of a large building for the Smithsonian Institution, entered into a contract with the Partridge partnership by the terms of which the latter was to furnish the former with a competent mechanical engineer for specialized work on the Smithsonian construction for a term of one year from January 15, 1960. The contract price was $7.50 an hour, which included personal supervision by a Partridge partner, if that should become necessary. It was agreed that if the engineer so furnished were found incompetent by Norair within two months after the beginning of the relationship, Part-

ridge would furnish a competent man in his stead, and its failure to do so within two weeks after notice would justify cancellation of the contract.

Early in April, 1960, when more than two months had elapsed, Norair advised Partridge that the work was unsatisfactory, and on April 26 gave written notice of cancellation. Partridge was paid for the period ending April 29, but furnished 26 hours of service from May 2 to May 5, both inclusive, for which it was not paid.

Partridge sued Norair on August 23, 1960, in the United States District Court. In its complaint the partnership alleged that, notwithstanding its competent performance of its obligations, Norair had wrongfully terminated the contract. It sought damages in the sum of $6,753.30. This amount was reduced in the pretrial proceedings, however, when Partridge asked damages of $5,264.55, which it itemized as follows:

"Services performed May 2, 1960 to May 5, 1960—26 hours at $7.50 per hour. $195.00
"Two weeks' notice to employee, 80 hours at $7.50 [per hour] 600.00 [1]
"Profit on balance of contract, 1366 man hours, at $3.272 per man hour 4,469.55"

After hearing evidence, during the presentation of which numerous exhibits were introduced, the trial judge, sitting without a jury, made findings of fact which included the following:

"2. On December 7, 1959, Seymour T. Partridge & Co. addressed a 'proposal' to defendant in which it was stated that 'These services are to be furnished by our company to your company on a contract basis and there will be no employer-employee relationship between us.' On December 11, 1959, the parties signed an 'Order' which referred to and incorporated the 'proposal' of December 7, 1959, stating 'This is an acceptance of your proposal of December 7, 1959 in general, but specifically as outlined in this order.' Under the terms of these documents the plaintiffs were to furnish a competent mechanical engineer and draftsman to take over the detailed layout of the mechanical work on the project. His services were to be furnished at $7.50 per hour, including any Workmen's Compensation, Social Security, Unemployment, or other employees' taxes. Payments were to be made monthly as the bills were presented. The plaintiffs were to personally supervise the engineer's work, if necessary, at no additional cost. The agreement was to be for one year, commencing January 15, 1960, and the defendant was to guarantee a minimum of forty hours per week in work during this period.

* * * * * *

"5. On the 15th day of January, 1960, the plaintiffs began their work, and one Elmer R. Stange was employed as the mechanical engineer and draftsman to take over the detailed layout of the mechanical work on the project.

"6. Two months went by, during which period Mr. Stange, under the supervision of Mr. Partridge, did the coordination work; and the defendant did not notify either Partridge or Stange, or anyone else that it wanted to terminate Stange's services. During this period, plaintiff Partridge spent, on occasion, eight hours per day at the job site supervising the work of Stange, and during the same period spent an average of four hours per day at the job site supervising the work of Stange. If the contract had continued to the expiration of its term, such supervision would have continued at the rate of four hours per day.

---

[1.] This figure was subsequently reduced by Partridge to $320.00, the actual amount to be paid to the engineer for the two weeks' notice.

"7. That the value of the supervision time of plaintiff Partridge was $7.50 per hour.

"8. Thereafter, on the 5th day of May, 1960, the defendant terminated the contract by refusing to allow the plaintiffs or their employee to continue on the job. That at that time, the plaintiffs had performed labor under the contract from May 2nd to May 5th inclusive, for which they had not been paid. That the sum due for such services was $195.00.

"9. That upon the breach of the contract by the defendant the plaintiffs were required to give two weeks' notice to the employee, Stange, becoming indebted to him in the amount of $320.00.

\* \* \* \* \* \*

"12. That there was no proper basis for the breach of the contract by the defendant."

From these and other findings we think it unnecessary to reproduce, the District Judge concluded: that the contract between the parties did not create the relation of employer and employee; that in this suit for lost profits, Partridge should recover the difference, if any, between the contract price of $7.50 per hour and the costs it would have incurred in completing its contractual obligations; that the time spent by Seymour T. Partridge in supervising the work for an average of four hours per day is properly includible as an item of cost to the partnership in performing the contract; and that there was no profit to the partnership after deducting the cost of supervision. He also concluded: "That the plaintiffs are entitled to recover from the defendant the costs of their performance from May 2, 1960 to May 5, 1960, in the amount of $195.00, and the cost of their two week notice to Stange in the amount of $320.00." Accordingly, Partridge was awarded judgment against Norair for $515, with interest from January 15, 1961.

The Partridge partnership noted an appeal from the judgment "in favor of said Plaintiffs," which we treat as a notice of appeal by the partnership from that part of the judgment which was unfavorable to it. This appeal bears our No. 16,400. Norair has also appealed, the case being No. 16,416.

I

In No. 16,416, Norair attacks as clearly erroneous the factual finding that Seymour T. Partridge, the supervising partner, and Elmer R. Stange, the engineer furnished by the partnership, properly performed the work required by the contract, and the finding that there was no proper basis for cancellation by Norair. The record contains conflicting evidence as to these matters. We cannot substitute our evaluation of it for that of the trial judge unless we are persuaded that he was plainly in error. As we cannot characterize his conclusions as clearly erroneous, it is necessary to affirm the judgment against Norair.

II

No. 16,400 is Partridge's appeal from the denial of its claim of $4,469.55 in damages for the loss of profit of $3.272 per hour on 1,366 hours which the engineer furnished by it would have worked had the contract not been cancelled. This alleged profit of $3.272 for each hour of his work was arrived at by subtracting from $7.50—the price to be paid by Norair—the sum of $4.228 [2] which Partridge conceived to be the cost of complying with the contract.

Norair pointed out that this calculation does not include the cost incurred by Partridge in furnishing supervision. Norair argued that, as Seymour T. Partridge had found it necessary to supervise for an average of four hours per day from the beginning until the termination of contract activity, similar supervision during the projected portion of the contract year should be regarded as a part of the partnership's cost of meeting its

2. Partridge paid its employee $4.00 per hour, and paid on his account 22.8¢ per hour in workmen's compensation, unemployment and social security taxes.

obligations. So, the 1,366 hours of its furnished engineer's time, on which Partridge claimed a profit, would have required 683 hours of supervision by a partner—one hour for each two worked by the partnership employee. The value of the time of the supervising partner was $7.50 per hour.[3]

Thus, contended Norair, Partridge's cost of compliance had been and would have continued to be the aggregate of the costs of the employee and the supervisor—$4.228 for the employee and $3.75 for supervision (one hour at $7.50 for each two hours worked by the employee). As the total hourly cost of $7.978 exceeds the contract price of $7.50, there would have been no profit to the partnership had the contract continued. Partridge argued, in response, that the supervisory time of one of its partners was not a proper element of its cost of compliance.

As we have seen, the District Court held this to be an action for lost profits in which Partridge is entitled to recover the difference, if any, between the contract price of $7.50 per hour and the costs it would have incurred in completing its obligations; that the value of the supervising partner's time, which it had found to be $7.50 per hour, was properly includible as an item of Partridge's costs of compliance; that, therefore, there would have been no profit to Partridge from the continuance of the contract.

■ From the foregoing, it is apparent that our task is to decide what the measure of damage is in a case of this sort. The task is simplified when it is realized that this is not an action to recover the value of services which would have been performed had the employer not breached the contract for their performance. Instead, it is an action to recover for the loss of profits which would have arisen from a contract to furnish a specified service, had it not been cancelled. That loss is, of course, the difference between the contract price and the cost of furnishing the service; the measure of damage is just as it would be if a tangible commodity instead of a service were required to be furnished.

■ Unquestionably, supervision was a part of the service to be rendered for the contractual hourly price of $7.50; and undoubtedly it cost the partnership something to furnish supervision, no matter who actually did the supervisory work— here found to be $7.50 per supervisory hour. This item was an element in Partridge's cost of compliance and must be included with the salary and insurance expense of the furnished employee in computing Partridge's cost which is to be deducted from the gross of $7.50 per hour in order to arrive at Partridge's net profit, if any.

Columbus Mining Co. v. Ross [4] is strikingly similar to the case before us. There the appellees had contracted with the appellant to clean out an abandoned entry to its coal mine and to drive the entry further into the coal; also for a space of one year to mine and remove coal for which appellant was to pay 47¢ per ton. The appellees were miners who personally worked but had the right to employ others to assist them. Alleging that, after partial performance, the appellant wrongfully refused to permit them to complete the contract, the appellees sued to recover damages measured by the profits they would have earned had they been permitted to continue throughout the term.

The appellees testified that during the unexpired term they could personally have mined 500 tons per month at a cost of only 3¢ per ton for "shooting material," and that the remaining 44¢ per ton would have been profit under the con-

---

3. Although this value is the same as the hourly rate fixed by the contract to be paid by Norair, the two items are entirely different and should not be confused. It is merely coincidence that the value of the partner's supervisory service is identical with the hourly rate Norair agreed to pay for the engineer furnished by Partridge and for supervision, when necessary, by one of the partners.

4. 218 Ky. 98, 290 S.W. 1052, 50 A.L.R. 1394 (1927).

tract. They also testified as to the value of their personal services in opening and extending the entry. The jury was allowed to and did return a verdict based on this testimony.

After pointing out that the suit was not to recover the value of services rendered but to recover profits which would have been realized had the contract continued, the Court of Appeals of Kentucky said, 290 S.W. at pages 1053–1054:

"In other words, the profits for measuring the damages for a breach of this kind of contract for the unperformed period consists in the difference between the contract price and the costs and expenditures of the performer in carrying it out if he had not been prevented from doing so by the breach of the other party. [Cases cited.] The case is not to be confused with one seeking a recovery for the deprivation of a contract for personal services pure and simple, and all the cases and authorities are unanimously agreed that the necessary labor in carrying out a contract of the nature here involved is a part of the expenditures in its performance, and must be taken into consideration in arriving at the net profits (which is the true measure of recovery) as distinguished from the gross earnings realized by full performance."

It was held that the labor of the appellees was "necessarily a part of the producing expenses," and should have been deducted from the contract price in determining the net profit which was lost through cancellation.

In the A.L.R. annotation to the case just discussed, it is said, 50 A.L.R. at page 1398:

"It is generally recognized that the value of the plaintiff's own services,

or, if the plaintiff be a corporation, of the services of its officers, not rendered because of a breach of contract, is a part of the cost of performance, and, as such, is a deductible item in computing damages for the breach."

The statement is supported by citation of cases from eight jurisdictions. Moreover, since its rendition the annotated case has been cited with approval by the courts of four other states.[5]

■ The principle stated above is thus well established and seems to us to be sound. We follow it, therefore, and hold that the value of the Partridge partner's supervisory service[6] was an element in the partnership's cost of meeting its contractual obligations and, together with the expense of furnishing the employee's services, should be deducted from the gross price of $7.50 in determining the profit, if any, which would have resulted from the completion of the term. As the partnership's cost, so computed, exceeded the gross amount received by it, there would have been no profit.

Cases cited by Partridge are not contrary to our holding; they tend to support it. For example, in King Features Syndicate v. Courrier, 241 Iowa 870, 43 N.W.2d 718, 726, 41 A.L.R.2d 467 (1950), the court quoted with approval the decision of Oakland California Towel Co. v. Sivils, 52 Cal.App.2d 517, 126 P.2d 651, 652 (1942), that:

" * * * [T]he true rule seems to be that the prospective profits should be diminished by charges composing an essential element in the cost of manufacture, or, as in this case, of service. * * * "

To be sure, the California court also said:

" * * * Essential elements in such cost do not include remote costs, overhead or otherwise, but are con-

5. Johnson v. Wright, 175 Minn. 236, 220 N.W. 946 (Minn.1928); McMahon v. Bryant Elec. Co., 121 Conn. 397, 185 A. 181 (Conn.1936); Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J.Super. 476, 138 A.2d 568 (N.J.1958); Buck

v. Mueller, 221 Or. 271, 351 P.2d 61 (Ore. 1960).

6. The trial court's finding that $7.50 was the value of each supervisory hour had support in the record and is not clearly erroneous.

fined to expenditures that would necessarily have been made in the performance of the contract. * * *"

In our case, remote costs such as overhead are not included in the cost of furnishing service which is to be deducted from the gross price in order to determine what profit, if any, would have resulted from continued performance.

M & R Contractors & Builders, Inc. v. Michael, 215 Md. 340, 138 A.2d 350, 354 (1958), also cited by Partridge, supports our holding by saying:

"* * * In such cases the loss of profits is generally measured by the difference between the contract price and the actual or estimated costs of full performance. * * *"

Partridge also cites our decision in J. D. Hedin Const. Co. v. F. S. Bowen Elec. Co., 106 U.S.App.D.C. 386, 388, 273 F.2d 511, 513 (1959), in which we said, as we intend to indicate here, that:

"In situations like the present, the innocent party is entitled to recover the loss of profit resulting from the breach of contract. The measure of the loss is the contract price less the costs which plaintiff would have incurred in completing his contract obligations. See, generally, M & R Contractors & Builders, Inc. v. Michael, 1958, 215 Md. 340, 138 A.2d 350. * * *"

The theory of our dissenting colleague demonstrates only that, for internal bookkeeping purposes of the partnership as an entity, the time of an individual partner is not an element of the partnership's cost of doing business. But in computing the partnership's cost of furnishing service to a third party as a basis for the determination of damages, it would be manifestly unjust, we think, to say the partner's time was worth nothing, even though the partnership's books did not assign a value to it.

Moreover, the theory of the dissent would cause Norair to be liable in damages to the partnership for a greater sum than it would have been to a corporation similarly situated. This seems to us to be obviously unfair. It is also true, as held in the Columbus Mining case, that an individual, situated as the Partridge partnership is here, cannot claim in a suit for damages for wrongful cancellation of the contract that the value of his personal contribution to the service is not an element of the cost of furnishing it. This partnership is not such an entity, apart from the individuals who compose it, that its internal accounting procedure can enhance Norair's liability by ignoring an undoubted element of cost.

We hold the trial court correctly defined the measure of damage and properly decided Partridge had not been damaged by the breach except in the sums for which judgment was awarded to it. Its ruling in No. 16,400 must therefore also be upheld.

No. 16,400, affirmed;

No. 16,416, affirmed.

FAHY, Circuit Judge (concurring in part and dissenting in part).

For the reasons given by Chief Judge MILLER in his opinion for the court I concur in affirmance of the judgment in favor of the appellees in No. 16,416.

In No. 16,400 I dissent. I agree with the position of the majority that the measure of damages for breach of the contract is the difference between the contract price and the costs and expenditures which would have been incurred by the partnership had it been permitted to render full performance. See J. D. Hedin Const. Co. v. F. S. Bowen Elec. Co., 106 U.S.App.D.C. 386, 388, 273 F.2d 511, 513. My disagreement lies in the application of this measure of damages to the facts of our case.

For the purpose of explaining my position I accept, as does the majority opinion, the finding of the District Court that the value of Partridge's supervisory service was $7.50 an hour and that the partnership, through the partner Partridge, would have been required to spend an average of four hours a day in supervising the work the partnership had contracted to perform. I also accept the

figures set forth in the opinion as representing the amounts which would have been expended in paying the firm's employee Stange, and the incidental costs of fulfilling the contract. But I think the court is mistaken in concluding from these facts that there would have been no profit to the partnership had it been permitted to complete performance of the contract. In the circumstances of this case the value per hour of Partridge's supervisory services was not a cost to be added as if it were a cost of carrying out the contract, and which, if so added, would eliminate any profit by lifting the cost of complete performance to an amount equal to or in excess of the payments to be received by the partnership from Norair.

The partnership was not paying Partridge $7.50 an hour or any similar amount in supervising the work of the firm's employee on the project. The only remuneration to be received by Partridge, or by his co-partner, was a proportionate share of the profits earned by the partnership business. A partner's time, in the absence of agreement, is freely given to the firm of which he is a member, and, absent agreement, he is not entitled to compensation for his services in attending to firm business. He is under a duty to render such services.[1]

Underlying the decisions relied upon by the majority is the basic assumption that the costs to be taken into consideration before arriving at profits must actually be incurred. There is a refinement in some of the cases that even if such costs are not to be incurred the abstract value of the services which would have been required to complete performance must be estimated, added to costs and thus used to diminish profits. But this refinement is not of general application and rests, as it seems to me, upon assumptions which this record does not permit us to make.

An examination of the cases indicates that in many instances the contractor was devoting a substantial amount of his time to performance of the contract, as would a hired employee. The courts have assumed that in these circumstances the defendant's breach has released the plaintiff from further performance, thereby permitting him to utilize his time for other profitable ventures. A failure to deduct the value of his time would therefore give plaintiff a double recovery. If, for example, Partridge, after the wrongful termination of the contract by Norair, utilized the four hours a day, from which he was thus released, so as to earn a similar amount elsewhere he could not recover from Norair since that would result in a double recovery. But if, as the evidence in this case shows, Partridge was not able to earn other compensation by utilizing the time he would have spent supervising performance of the contract, there would be no double recovery should Norair be required to compensate for the loss brought about by its unlawful termination of the contract.

As above stated, Partridge was not being paid a salary by his partnership. The time spent by him in supervision was not an out-of-pocket cost or expenditure by the firm in performing the contract. By deducting the value of Partridge's services as if it would have been an item of cost, the court has deprived the partnership of the profits it would have earned had it been permitted to complete the contract.

The above approach to the problem has been carefully analyzed and approved in Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J.Super. 476, 138 A.2d 568 (App.Div.1958), where it is pointed out that such cases as this should be decided on their own factual basis and not on an unrealistic and, in some instances, as here, purely fictional, assumption with respect to costs. In Apex Metal, the court said in part:

"The defendant's argument is that the cost of production for this purpose should have included the value of the services of the partners on the theory that these were supervisory

1. See Crane, Partnership § 65, at 349–54 (2d ed. 1952).

or management services necessary in the production attendant upon completion of the contract. There is considerable general authority in support of this viewpoint. * * * Examination of the cases cited, however, will indicate that, by and large, they involve contract undertakings in which the owner or contracting party is devoting a substantial part of his personal efforts and time to the work just as would a hired employee, and it is apparently assumed that since the defendant's default has released the party from further involvement in the performance of the contract and made him available for other employment of his time and effort, a failure to deduct the value of the time would, in effect, give plaintiff a double recovery as to that element of the cost of production.

*  *  *  *  *  *

"A more realistic approach would place each such case on its own factual basis, requiring an initial assumption that the value of the contractor's time be included in the cost of production, but permitting the plaintiff to show, if he can, that the actual loss of bargain resulting from the breach does not call for diminution by that factor because the default has not, in fact, freed the contractor for attention to other enterprises in which he has been able with equal profit to deploy his efforts * * *." 48 N.J.Super. at 484–485, 138 A.2d at 572–573.

This is the situation presented by this record. In my opinion, therefore, the most that Norair is entitled to on this appeal is a remand for further evidentiary exploration, if Norair so desires, of the facts regarding the possibility of a double recovery, or possibly of neglect [2] on the part of Partridge to earn what he reasonably could have earned for the partnership through utilization of the time made available by the illegal termination of the contract.[3] If, as presently appears, there would have been no double recovery and no such neglect, then the partnership would be entitled to damages measured by the loss of profits, that is, the difference between the contract price of $7.50 per hour and the actual costs which would have been paid out in performance of the contract, without including among the cost items the value of the supervisory time which would have been expended by Partridge had the contract gone to completion.

My views do not turn, as the majority opinion seems to suggest, upon a method of internal bookkeeping; nor do I say that the partner's time was worth nothing, when he worked at some income producing task. What I do say is that in my opinion when Norair breached the contract the value of the partner's time when working may not properly be said to be a cost the partnership would have incurred in fulfilling this contract. To say otherwise is to say that if the value of a partner's time is the same as the contract price to be paid the partnership the partners can earn no profit under such a contract and cannot recover any damages

2. I deliberately leave vague this idea of neglect because my views in dissent do not prevail in this case. In that situation I prefer to leave open for the future this aspect of the matter.

3. In Joske v. Pleasants, 15 Tex.Civ.App. 433, 39 S.W. 586, 590 (1897), an action to recover damages for breach of a building contract, the court found that the proper measure of damages was "the difference between the contract price and the actual cost of construction * * * less the value of the contractor's time (if he found other employment in which his time was equally or more valuable)

that would have been employed in the performance of the contract." This decision supports my position in that the deduction of the value of a contractor's time is made dependent upon whether he obtained equally profitable employment of his released time resulting from the breach of contract. If he did, the value of such time will be deducted from the expected gains under the contract since if it was not the contractor would be the recipient of a double recovery. If not, the value of his time or service should not be considered in the cost of completion. See Annot., 50 A.L.R. 1399, 1400 (1927).

for its breach. This is an interesting way of permitting a contract to be broken without consequences to the one who breaks it, notwithstanding the fact that the other party actually suffers a pecuniary loss when it is not recouped by other employment of his time.

The court suggests that it would be unfair to adopt my theory of this case because a corporation could not recover from Norair in similar circumstances. But the corporation would incur the actual costs represented by the salary or wages of the supervising employee. The employee would receive the benefit of this compensation, and, of course, the profit of the corporation could be calculated only after such an expenditure was taken into account. Presumably the employee would be transferred to other work producing an income for the corporation, if released from the contract job because of the termination of the contract.