**VITEX MANUFACTURING CORPORATION, LTD.**

v.

**CARIBTEX CORPORATION, Appellant**

No. 16,064

United States Court of Appeals

Third Circuit

Argued February 2, 1967

Filed April 26, 1967

*See, also, 377 F.2d 795*

Leon S. Forman, Esq. (Wexler, Mulder and Weisman), Philadelphia, Pa., U.S.A., *for appellant*

William Bailey, Esq. (Bailey & Wood), Charlotte Amalie, St. Thomas, Virgin Islands, *for appellee*

Before STALEY, *Chief Judge,* and MARIS and COFFIN,[*] *Circuit Judges*

STALEY, *Chief Judge*

## OPINION OF THE COURT

This is an appeal by the Caribtex Corporation from a judgment of the District Court of the Virgin Islands finding Caribtex in breach of a contract entered into with Vitex Manufacturing Company, Ltd., and awarding $21,114 plus interest to Vitex for loss of profits. The only substantial question raised by Caribtex is whether it was error for the district court, sitting without a jury, not to consider overhead as part of Vitex's costs in determining the amount of profits lost. We conclude that under the facts presented the district court was not compelled to consider Vitex's overhead costs, and we will affirm the judgment.

Before discussing the details of the controversy between the parties, it will be helpful to briefly describe the peculiar legal setting in which this suit arose. At the time of the

---

[*] Sitting by designation.

events in question, there were high tariff barriers to the importation of foreign wool products. However, under § 301 of the Tariff Act of 1930, 19 U.S.C.A. § 1301a, repealed but the provision continued under Revised Tariff Schedules, 19 U.S.C.A. § 1202, note 3 (a) (i) (ii) (1965), if such goods were imported into the Virgin Islands and were processed in some manner so that their finished value exceeded their importation value by at least 50%, then the high tariffs to importation into the continental United States would be avoided. Even after the processing, the foreign wool enjoyed a price advantage over domestic products so that the business flourished. However, to keep the volume of this business at such levels that Congress would not be stirred to change the law, the Virgin Islands Legislature imposed "quotas" on persons engaging in processing, limiting their output. 33 V.I.C. § 504 (Supp. 1966).

Vitex was engaged in the business of chemically showerproofing imported cloth so that it could be imported dutyfree into the United States. For this purpose, Vitex maintained a plant in the Virgin Islands and was entitled to process a specific quantity of material under the Virgin Islands quota system. Caribtex was in the business of importing cloth into the islands, securing its processing, and exporting it to the United States.

In the fall of 1963, Vitex found itself with an unused portion of its quota but no customers, and Vitex closed its plant. Caribtex acquired some Italian wool and subsequently negotiations for a processing contract were conducted between the principals of the respective companies in New York City. Though the record below is clouded with differing versions of the negotiations and the alleged final terms, the trial court found upon substantial evidence in the record that the parties did enter into a contract in which Vitex agreed to process 125,000 yards of Caribtex's woolen material at a price of 26 cents per yard.

169

Vitex proceeded to re-open its Virgin Islands plant, ordered the necessary chemicals, recalled its work force and made all the necessary preparations to perform its end of the bargain. However, no goods were forthcoming from Caribtex, despite repeated demands by Vitex, apparently because Caribtex was unsure that the processed wool would be entitled to duty-free treatment by the customs officials. Vitex subsequently brought this suit to recover the profits lost through Caribtex's breach.

■ Vitex alleged, and the trial court found, that its gross profits for processing said material under the contract would have been $31,250 and that its costs would have been $10,136, leaving Vitex's damages for loss of profits at $21,114. On appeal, Caribtex asserted numerous objections to the detailed computation of lost profits.[1] While the record below is sometimes confusing, we conclude that the trial court had substantial evidence to support its findings on damages. It must be remembered that the difficulty in exactly ascertaining Vitex's costs is due to Caribtex's wrongful conduct in repudiating the contract before performance by Vitex. Caribtex will not be permitted to benefit by the uncertainty it has caused. Thus, since there was a sufficient basis in the record to support the trial court's determination of substantial damages, we will not set aside its judgment. Stentor Elec. Mfg. Co. v. Klaxon Co., 115 F.2d 268 (C.A.3, 1940), rev'd other grounds 313 U.S. 487 (1941); 5 Williston, Contracts § 1345 (rev. ed. 1937).

---

[1] As originally transcribed, Vitex's costs appeared to have been understated by $4,500 because the transcript read "Q. But, at 5 cents a gallon for oil what is necessary to run the plant for one week * * *? A. We estimated that we would need 37,000 gallons and at 5 cents a gallon, that came to $350 and the balance of the $37, we estimated for the trucking of the oil to our plant. Court: What is that total? A. [Witness] $387."

However, 37,000 × $0.05 = $1,850 per week, not $350 and since the plant required fuel oil for three weeks, Vitex appeared to be understating its costs by $4,500. Subsequently, the official reporter reviewed his notes and certified to this court that the witness replied "We estimated we would need *7,000* gallons ..." rather than 37,000. As such, no error appears in the cost of fuel oil.

■ Caribtex first raised the issue at the oral argument of this appeal that the trial court erred by disregarding Vitex's overhead expenses in determining lost profits. In general, overhead "* * * may be said to include broadly the continuous expenses of the business, irrespective of the outlay on a particular contract." Grand Trunk W.R.R. v. H. W. Nelson Co., 116 F.2d 823, 839 (C.A.6, 1941). Such expenses would include executive and clerical salaries, property taxes, general administration expenses, etc.[2] Although Vitex did not expressly seek recovery for overhead, if a portion of these fixed expenses should be allocated as costs to the Caribtex contract, then under the judgment of the district court Vitex tacitly recovered these expenses as part of its damages for lost profits, and the damages should be reduced accordingly. Presumably, the portion to be allocated to costs would be a pro rata share of Vitex's annual overhead according to the volume of business Vitex would have done over the year if Caribtex had not breached the contract.

■ Although there is authority to the contrary, we feel that the better view is that normally, in a claim for lost profits, overhead should be treated as a part of gross profits and recoverable as damages, and should not be considered as part of the seller's costs. A number of cases hold that since overhead expenses are not affected by the performance of the particular contract, there should be no need to deduct them in computing lost profits. E.g., Oakland California Towel Co. v. Sivils, 52 Cal. App.2d 517, 520, 126 P.2d 651, 652 (1942); Jessup & Moore Paper Co. v. Bryant Paper Co., 297 Pa. 483, 147 Atl. 519, 524 (1929); Annot., 3 A.L.R.3d 689 (1965) (collecting cases on both sides of the controversy). The theory of these cases is that the seller

---

[2] Caribtex could not be referring to overhead expenses as including labor costs and the like, because the trial judge did charge as costs all the expenses directly associated with the reactivation of Vitex's plant, and the actual processing of Caribtex's goods according to the terms of the contract.

171

is entitled to recover losses incurred and gains prevented in excess of savings made possible, Restatement, Contracts § 329 (made part of the law of the Virgin Islands, 1 V.I.C. § 4); since overhead is fixed and nonperformance of the contract produced no overhead cost savings, no deduction from profits should result.

■ The soundness of the rule is exemplified by this case. Before negotiations began between Vitex and Caribtex, Vitex had reached a lull in business activity and had closed its plant. If Vitex had entered into no other contracts for the rest of the year, the profitability of its operations would have been determined by deducting its production costs and overhead from gross receipts yielded in previous transactions. When this opportunity arose to process Caribtex's wool, the only additional expenses Vitex would incur would be those of re-opening its plant and the direct costs of processing, such as labor, chemicals and fuel oil. Overhead would have remained the same whether or not Vitex and Caribtex entered their contract and whether or not Vitex actually processed Caribtex's goods. Since this overhead remained constant, in no way attributable-to or affected-by the Caribtex contract, it would be improper to consider it as a cost of Vitex's performance to be deducted from the gross proceeds of the Caribtex contract.

However, Caribtex may argue that this view ignores modern accounting principles, and that overhead is as much a cost of production as other expenses. It is true that successful businessmen must set their prices at sufficient levels to recoup all their expenses, including overhead, and to gain profits. Thus, the price the businessman should charge on each transaction could be thought of as that price necessary to yield a pro rata portion of the company's fixed overhead, the direct costs associated with production, and a "clear" profit. Doubtless this type of calculation is used by businessmen and their accountants. Pacific Portland

Cement Co. v. Food Mach. & Chem. Corp., 178 F.2d 541 (C.A.9, 1949). However, because it is useful for planning purposes to allocate a portion of overhead to each transaction, it does not follow that this allocate share of fixed overhead should be considered a cost factor in the computation of lost profits on individual transactions.

First, it must be recognized that the pro rata allocation of overhead costs is only an analytical construct. In a similar manner one could allocate a pro rata share of the company's advertising cost, taxes and/or charitable gifts. The point is that while these items all are paid from the proceeds of the business, they do not normally bear such a direct relationship to any individual transaction to be considered a cost in ascertaining lost profits.

Secondly, even were we to recognize the allocation of overhead as proper in this case, we should uphold the tacit award of overhead expense to Vitex as a "loss incurred." Conditioned Air Corp. v. Rock Island Motor Transit Co., 253 Iowa 961, 114 N.W.2d 304, 3 A.L.R.3d 679, cert. denied, 371 U.S. 825 (1962). By the very nature of this allocation process, as the number of transactions over which overhead can be spread becomes smaller, each transaction must bear a greater portion or allocate share of the fixed overhead cost. Suppose a company has fixed overhead of $10,000 and engages in five similar transactions; then the receipts of each transaction would bear $2000 of overhead expense. If the company is now forced to spread this $10,000 over only four transactions, then the overhead expense per transaction will rise to $2500, significantly reducing the profitability of the four remaining transactions. Thus, where the contract is between businessmen familiar with commercial practices, as here, the breaching party should reasonably foresee that his breach will not only cause a loss of "clear" profit, but also a loss in that the profitability of other transactions will be reduced. Resolute Ins. Co. v. Percy

173

Jones, Inc., 198 F.2d 309 (C.A.10, 1952); cf. In re Kellett Aircraft Corp., 191 F.2d 231 (C.A.3, 1951). Therefore, this loss is within the contemplation of "losses caused and gains prevented," and overhead should be considered to be a compensable item of damage.

■ Significantly, the Uniform Commercial Code, adopted in the Virgin Islands, 11A V.I.C. § 1—101 et seq., and in virtually every state today, provides for the recovery of overhead in circumstances similar to those presented here. Under 11A V.I.C. § 2—708, the seller's measure of damage for non-acceptance or repudiation is the difference between the contract price and the market price, but if this relief is inadequate to put the seller in as good position as if the contract had been fully performed, " * * * then the measure of damages is the *profit* (*including reasonable overhead*) which the seller would have made from full performance by the buyer * * *." 11A V.I.C. § 2—708(2). (Emphasis added.) While this contract is not controlled by the Code, the Code is persuasive here because it embodies the foremost modern legal thought concerning commercial transactions. Indeed, it may overrule some of the cases denying recovery for overhead. E.g. Willhelm Lubrication Co. v. Brattrud, 197 Minn. 626, 632, 268 N.W. 634, 636 (1936).

■ Caribtex also argued that the contract should not be enforced because it was unconscionable. While Vitex was to make a large profit on the processing and Caribtex did bear the risk of failure to meet customs standards, the contract was freely entered-into, after much negotiation, between parties of apparently equal bargaining strength. This was not a contract of adhesion—Vitex was not the only processor in the Virgin Islands and Caribtex's bargaining strength was evidenced by the successive and sub-

stantial price reductions it wrested from Vitex during the negotiations. Compare, Campbell Soup Co. v. Wentz, 172 F.2d 80 (C.A.3, 1948); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960).