532 A.2d 694

**DAVID SLOANE, INC. et al.**

v.

**STANLEY G. HOUSE & ASSOCIATES, INC. et al.**

**No. 10, Sept. Term, 1987.**

Court of Appeals of Maryland.

Oct. 30, 1987.

Walter A. Oleniewski (Ashley Joel Gardner, Ian Charles Ballon and Shulman, Rogers, Gandal, Pordy & Ecker, P.A., on brief), Silver Spring, for appellant.

Arthur G. House (Hadley & House, on brief), Bethesda, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., and JAMES F. COUCH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

RODOWSKY, Judge.

In this action an advertising agency recovered damages for an advertiser's breach of an exclusive agency contract. The principal question presented is whether the award is excessive because the plaintiff's fixed costs of doing business were not deducted in computing damages for "lost profits."

By a written contract effective January 9, 1978, appellant and cross-appellee, David Sloane, Inc., trading as "Sassaf-

ras!" (Sloane), appointed appellee and cross-appellant, Stanley G. House & Associates, Inc. (House), as Sloane's "exclusive advertising agency and public relations counsel."[1] The contract provided for commissions at an effective rate of fifteen percent of the gross billings by "media (such as radio, TV, billboards, out-of-town or suburban papers, magazines, etc.)." The charge for "regular staff production time, from copy to layout to tearsheet" was at a then current, specified hourly rate, while "[c]harges for creative copy and art services on specialties ..., priority assignments, overtime, etc." were to be quoted in advance for Sloane's approval. House promised to keep a daily log of time spent on the Sloane account which would be open to Sloane's review on request.

The initial term of the contract was six months, terminable by either party through written notice. Absent notice of termination the agreement automatically renewed for successive terms of one year each. Either party could terminate at the expiration of a renewal term by ninety days prior written notice.

The contract was breached January 1, 1984, when Sloane, which operates women's retail clothing stores, began using another agency, Goldberg–Marchesano (G–M). In the spring of 1983, Sloane had determined to enlarge its advertising expenditures. It caused a market survey to be made and then held a competition for its business among advertising agencies, including House. By a letter dated December 19, 1983, Sloane advised House that another agency had been selected to handle Sloane's 1984 advertising campaign. This letter constituted the earliest written notice of Sloane's termination of the 1978 exclusive contract which had been

---

1. The agency appointment also ran to Sight & Sound, Inc., a corporation related to House by common ownership, which was a plaintiff below and is an appellee and cross-appellant here. An additional defendant below which is an appellant and cross-appellee here is Ruth Rider, Inc., the parent corporation of Sloane. The presence in the litigation of parties in addition to House and Sloane is immaterial to the issues on this appeal.

renewing automatically. The earliest date for that termination to be effective, however, was the next anniversary, July 9, 1984.

House sued Sloane and the case was tried to the court. G–M's records of the work it did for Sloane from January 1 through July 9, 1984, were the starting point for House's damage evidence. Those records reflected media billings to which House applied the commission rate provided under its contract with Sloane. G–M's invoices to Sloane also enabled House to identify by descriptive categories such as "creative," "production," and "finished art," the amount charged on an hourly basis by G–M for each category of work on a particular job. House divided the amount billed by G–M by the highest G–M hourly rate for a particular category and then multiplied the number of hours of activity thereby determined by the lowest rate utilized by House for that type of work. Under this method the value to House of commissionable and hourly fee work for the relevant period was computed to be $103,050.71.

House made two deductions from that figure. Under the contract between Sloane and G–M there was a discount on media commissions as compared to commissions under the Sloane–House contract. House adjusted its damage calculation to allow Sloane that discount. House also subtracted the $2,500 cost of an artist whom it would have needed to have performed all of the work done by G–M for Sloane during the January 1 to July 9, 1984 period. These deductions produced an adjusted lost profit figure of $74,161.21.[2]

The trial court awarded this lost profit figure and based the award on the testimony of Stanley G. House, the owner of the plaintiff agency. He testified that his agency could have performed the same types of work that G–M performed for Sloane and that he had absolutely no question about the ability of his agency to handle the work from a quantitative point of view even though G–M's hourly billed

---

2. The plaintiff's damage calculation was actually $.50 higher, but no point has been made over the discrepancy.

work for Sloane during the relevant period amounted to 1,693 hours. House also testified that there would not have been any increase in House's "overhead by virtue of handling [the Sloane] account, in the way of rent, electricity or subcharges." The only savings House realized by not having to perform the Sloane contract was the $2,500 cost of an artist. The trial judge found that House had been "conservative and reasonable" and had cut the amount of damages "to the bare bones."

The Sloane–House contract also contains a mutual covenant to pay reasonable attorney's fees incurred in enforcing the contract. The trial court awarded House "attorney's fees in the amount of 20% of $74,161.21." After having decided initially to allow prejudgment interest from July 9, 1984, the trial judge struck prejudgment interest in ruling on a post-judgment motion.

Both parties appealed and we granted certiorari on our own motion before the matter was considered by the Court of Special Appeals.

Stated succinctly these appeals present claims that the trial court erred in:

   I.  The damage award because

     A.  comparison to G–M was unfounded and

     B.  House proved gross revenues rather than net profits;

  II.  The counsel fee award because it cannot be based on a percentage of the recovery; and

 III.  The denial of prejudgment interest because the denial was an abuse of discretion.

## I

Broadly speaking, Sloane's many faceted arguments against the damage award have in common the criticism that House did not meet its burden of proving damages with certainty. In *M & R Contractors & Builders, Inc. v. Michael,* 215 Md. 340, 138 A.2d 350 (1958), we noted that

the certainty rule has been modified into one of "reasonable certainty." Modifications enumerated there were:

> (a) [I]f the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the exact amount is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits. [*Id.* at 349, 138 A.2d at 355.]

### A

█ Sloane questions the court's use of G–M's work on the Sloane account as a measure of the amount of work which would have been done for Sloane by House. At the outset Sloane argues that House was required to demonstrate the comparability of the operations at G–M to those at House as a foundation for recovery. House was not, however, attempting to show that the profits, if any, enjoyed by G–M would be the same as those which House would have enjoyed. House looked to the G–M experience to prove the volume of advertising activity actually done for Sloane during the relevant period. To that known output of work House applied the charges agreed to in its contract with Sloane, less the same discount on media placements given by G–M.

Sloane also submits that the amount of advertising placed by it through G–M does not prove the amount which it would have placed through House had Sloane honored the exclusive agency contract. The trial court, however, was not clearly erroneous in accepting the relationship between the two contracts, particularly in light of Sloane's intent to embark on an expanded advertising campaign in 1984.

One of the recognized methods of proving prospective profits is to use "[p]rofits made by others, as in the case of

the breach of a contract of exclusive agency[,] evidence of the profits made by the infringer are admissible to prove the plaintiff's loss." 11 W. Jaeger, *Williston on Contracts* § 1346A, at 249 (3d ed. 1968) (footnotes omitted). *Macke Co. v. Pizza of Gaithersburg, Inc.*, 259 Md. 479, 270 A.2d 645 (1970), for example, involved a claim for lost profits by the owner of cold drink vending machines whose right to place the machines in the defendant's pizza shops had been prematurely and wrongfully terminated. Reversing for a new trial on damages, we observed that if the plaintiff's machines had been replaced in the shops by comparable machines provided by another "a more appropriate measure of damages might be that grounded on the five Pizza Shops' actual experience for the period [following wrongful termination], rather than one based on extrapolating profits from the results experienced" by the plaintiff in the pretermination period. *Id.* at 492, 270 A.2d at 652. *See generally John B. Robeson Assoc. v. Gardens of Faith, Inc.*, 226 Md. 215, 172 A.2d 529 (1961); *McKeever v. Washington Heights Realty Corp.*, 183 Md. 216, 37 A.2d 305 (1944); *National Micrographics Systems, Inc. v. OCE–Industries, Inc.*, 55 Md.App. 526, 465 A.2d 862 (1983).

## B

The burden was on House to prove its claimed lost profits with reasonable certainty. *Stuart Kitchens, Inc. v. Stevens*, 248 Md. 71, 234 A.2d 749 (1967). The measure of damages for breach of contract is addressed generally in Restatement (Second) Contracts, § 347 (1981) which recognizes that

the injured party has a right to damages based on his expectation interest as measured by

(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that he has avoided by not having to perform.

Sloane submits that House did not prove its lost profits and that the judgment erroneously awards gross income instead of net profits. The defendant points out that, other than $2,500 for an artist's services, House's proof of damages presented no deductions from the projected gross receipts of the Sloane contract for salaries, rent, and other expenses of doing business.

■ House submitted to the trial judge and submits to us that it was required to reduce its projected income on the Sloane account only by the additional cost which House would have incurred in performing. Critical to House's legal argument is the evidence that, but for the services of an artist at a cost of $2,500, House had the continuing capacity to perform all of the work required under the Sloane contract during the relevant period. In our review, we consider that the trial court found those facts to be true and on those facts there was no error in applying House's theory of damages.

Sloane contracted to use House exclusively but nothing limited House to rendering services exclusively for Sloane. "It can hardly be doubted that an advertising agency, like a builder, can make its special skills available simultaneously to an indefinite number of clients and 'make a profit on all of them.' " *American Motor Inns, Inc. v. A.W.L. Advertising Agency, Inc.,* 253 Md. 654, 664, 254 A.2d 191, 197 (1969) (quoting Patterson, *Builder's Measure of Recovery for Breach of Contract,* 31 Colum.L.Rev. 1286, 1306 (1931)). Here the evidence supported a finding that House, using primarily its existing staff, could have done the work which it otherwise had from January 1 through July 9, 1984, as well as the work for Sloane.

Basically House's position is that it, as a seller of services under a nonexclusive contract, is permitted to compute expectation interest damages by including reasonable overhead in lost profit in much the same manner as the lost volume seller of goods may compute damages under

§ 2–708(2) of the Uniform Commercial Code.[3]  The theory underlying the award to a seller of damages measured by the contract price less variable costs, but not fixed costs, is illustrated by an example in Childres & Burgess, *Seller's Remedies: The Primacy of UCC 2–708(2)*, 48 N.Y.U.L.Rev. 833 (1973).  The example shows why the seller is not placed in as good a position as if the repudiated contract had been performed if the rule for computing damages requires an allocation of fixed costs to the repudiated contract.[4]

---

**3.**  Maryland Code (1975), § 2–708(2) of the Commercial Law Article provides:

> If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this title (§ 2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

**4.**  Application of the analysis to a specific case requires classifying costs as variable costs or fixed costs.  Childres & Burgess give the following description of those concepts.

> In the broad sense, all of the seller's costs are necessary to the production of revenues.  Each expense plays a role in the present and continuing operations of the business, and the central object of the business is to make sales in order to produce revenues and ultimately profits.  Nevertheless, some costs are more directly related to the performance of individual contracts than are others, and their amount will vary with the volume of sales output.  The other expenses will remain relatively stable through a given range of output because they bear no direct relationship to the individual contracts.  Accountants and economists refer to these two distinct kinds of costs as variable and fixed; the latter is also commonly referred to as overhead.
>
> The variable element represents those items of cost which may be identified as belonging to a specific contract or product of sale.  For example, the cost of materials and labor which go directly into the production of contract goods are considered variable costs—they vary with the number of contracts which are performed.  If the contract is not performed they presumably are not incurred.  An example of a variable cost for a nonmanufacturing seller is the cost to him of purchasing from his supplier a product intended for resale.
>
> In contrast to items of cost which vary directly with the volume of output, there are costs which have only an indirect relation to output.  These costs are necessary to the maintenance of the business but do not change except with significant changes in output.

The first step of the illustration assumes that all contracts of the seller during the relevant accounting period are fully performed by the buyers with the result from operations set forth below:

| Sales (total of all contract prices) | $500,000 |
|---|---|
| Variable Costs | −325,000 |
| Gross Profit | $175,000 |
| Fixed Costs | − 50,000 |
| Net Profit | $125,000 |

Next, assume that one of the contracts, with a price of $50,000, is repudiated by the buyer. Assume further that the variable costs of that contract and the portion of total fixed costs which a cost accountant would allocate to the repudiated contract are in the same ratio to expected total variable and fixed costs as is the ratio of the contract price to the total of all contract prices in the accounting period. Under an approach which awards as damages the seller's "net profit," our hypothetical seller's award would be computed as follows:

For example, rental payments or depreciation on a plant, warehouse, store or office may be the same whether few products are produced and sold or many are. Executive salaries are usually fixed costs and are set before the precise output has been determined. Clerical and administrative salaries, and advertising and insurance costs also may not vary within certain production or sales ranges. All of these costs may or may not be considered fixed costs in a particular period, but if they are, they are attributed to that period's total output.

It has been said that fixed costs are those which "continue if the firm is *temporarily* shut down, producing nothing at all." Whether this is a completely accurate statement need not be decided, for the precise amount of any seller's costs has to be established by experts in each particular controversy. What may be a fixed cost to one seller may be a variable cost to another and, in fact, may be a variable cost to the same seller at a different volume of manufacture or sales. For our purposes it is only important that we understand the difference. [48 N.Y.U.L.Rev. at 840–41 (footnotes omitted).]

| Price | $ 50,000 |
|---|---|
| Variable Costs | – 32,500 |
| Gross Profits | $ 17,500 |
| Fixed Costs | – 5,000 |
| Net Profit | $ 12,500 |

If we recast, however, the seller's results of operations for the accounting period to reflect nonpayment of the repudiated contract price and the actual savings effected by the seller's having been excused from performing, the operational results would be:

| Sales | $450,000 |
|---|---|
| Variable Costs | –292,500 |
| Gross Profits | $157,500 |
| Fixed Costs | – 50,000 |
| Net Profit | $107,500 |

This reflects a $17,500 difference in the seller's net profit for the accounting period between the full performance scenario and the repudiation scenario. But a rule of damages under which some portion of fixed costs must be allocated to the repudiated contract results in a recovery, in the example, of only $12,500. Allocating $5,000 of fixed costs to the repudiated contract does not award damages which place the seller in as good a position as if the contract had been performed.

When we convert the evidence in the case before us to the terminology of the foregoing example, House's evidence was that its variable costs were $2,500 and that all of the other costs associated with performing the Sloane contract were fixed.

The principle for which House contends was applied in *Katz Communications, Inc. v. Evening News Ass'n*, 705 F.2d 20 (2d Cir.1983). The defendants, the owners of radio and television stations in Oklahoma City, had contracted with the plaintiff, an organization headquartered in New York City, for the latter to be the former's exclusive national advertising representative. The plaintiff also performed that service for more than one hundred other television stations. When the defendants breached and the plaintiff sued, the trial court awarded lost profit damages based on

the plaintiff's rate of commission applied to the defendants' total national advertising revenue for the balance of the contract term, less the cost of communications between New York and Oklahoma City which was saved because of the breach. The defendants contended that "recoverable damages should be diminished by the amount of salaries, wages, and other overhead or indirect or fixed costs which [plaintiff], in [defendants'] view, could have saved once it was apprised of the [defendants'] breach." *Id.* at 26. In rejecting that contention the Second Circuit held:

[W]e agree with the lower court that [plaintiff] could not lighten its overhead costs in the brief period *after* it received the August 21, 1979 notice of immediate cancellation ... and *before* the permissible December 18, 1979 termination of the contract. Even if an employee could lawfully have been dismissed before December 18, 1979 by a notice given August 21, 1979 or thereafter, it was not unreasonable for [plaintiff] to keep the employee either in the hope that appellants could be persuaded to change their minds, or that [plaintiff], as a "lost volume seller," could find new customers. Moreover, we are not persuaded that when a customer or client breaks a contract with an advertising or like professional organization, the wrongdoer may successfully contend that the damages suffered by the wronged party should be diminished if the wronged party does not forthwith at least partially dismantle the organization he has created and thus disable himself from promptly and fully responding to potential opportunities in the near future. Nor are we unmindful that one consequence of our adoption of the appellants' contention would be that hereafter employees or organizations like [plaintiff's] would in all likelihood be, in situations such as the one at bar, the undeserved victims of a precipitate determination to discharge them. The wrongdoer's interest in prompt mitigation of damages is of no greater public concern than is the innocent worker's interest in avoiding becoming one of the army of unemployed. [*Id.*]

Also analogous to the case at hand is *Schubert v. Midwest Broadcasting Co.*, 1 Wis.2d 497, 85 N.W.2d 449 (1957). The defendant was a local television station in Wisconsin and the plaintiff was the producer for television stations throughout the country of a prepackaged quiz program in which the questions to contestants were based on "minute movies." The plaintiff supplied prints of the movies, questions and answers, and savings bonds as prizes. The defendant agreed to pay $100 per week for fifty-two weeks of quiz show materials, but breached after twelve weeks. The trial court awarded $100 per week for forty weeks less only $3 per week saved in the costs of delivering the films and materials. The proof showed that the plaintiff had enough films and materials in inventory to service over one hundred television stations. The bonds awarded as prizes were donated by advertisers in exchange for free advertising on the show. The plaintiff maintained a prize department for soliciting bonds for all of the shows. "The overhead for maintaining this department was fixed and no saving in the expense of operating [plaintiff's] office was effected because one subscriber did not televise the show." *Id.* at 504, 85 N.W.2d at 453. The Supreme Court of Wisconsin affirmed saying that the plaintiff was entitled to the fixed price "less any savings accruing to plaintiff because he was not able to complete the contract." *Id.* at 502, 85 N.W.2d at 452.

Similarly, an automobile dealer, claiming lost profits for breach by the manufacturer of a dealership contract, was not required to deduct administrative salaries, real estate taxes and insurance, building maintenance and depreciation, auditing and legal expenses, and the cost of heat, light, and water when those fixed expenses were not affected by the defendant's breach. *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715 (3d Cir.1971). Executive and clerical salaries, property taxes, and general administration expenses were not deductible from the contract price in computing the lost profits of a plant which had reopened to process wool for the defendant, but expenses directly asso-

ciated with reactivating the plant and with the actual processing of the wool were properly deducted. *Vitex Mfg. Corp. v. Caribtex Corp.*, 377 F.2d 795 (3d Cir.1967). "Since this overhead remained constant, in no way attributable-to or affected-by the Caribtex contract, it would be improper to consider it as a cost of Vitex's performance to be deducted from the gross proceeds of the Caribtex contract." *Id.* at 798.

Also supporting House's position in this case are: *Automatic Vending Co. v. Wisdom*, 182 Cal.App.2d 354, 358, 6 Cal.Rptr. 31, 33 (Cal.Dist.Ct.App.1960) ("[R]espondent's costs of doing business were fixed and would not diminish because of the loss of the right to place one of its cigarette vending machines in appellant's cafe."); *Oakland California Towel Co. v. Sivils*, 52 Cal.App.2d 517, 520, 126 P.2d 651, 652 (Cal.Dist.Ct.App.1942) ("If the fixed expenses [of plaintiff's linen supply business] neither increased nor decreased as a consequence of the nonperformance of the contract, there would be no loss or benefit arising from that factor."); *King Features Syndicate v. Courrier*, 241 Iowa 870, 43 N.W.2d 718 (1950) (fixed expenses of wire news service not deductible in computing lost profits following breach of subscription contract by radio station); *F.A. Bartlett Tree Expert Co. v. Hartney*, 308 Mass. 407, 32 N.E.2d 237 (1941) (when recovering lost profits from former employee in tree surgeon business, the overhead costs of the former employer need not be deducted when they were not materially decreased by the loss of orders improperly procured by the former employee); *Covington Brothers v. Valley Plastering, Inc.*, 93 Nev. 355, 363, 566 P.2d 814, 819 (1977) ("Where [plaintiff's] overhead remains constant notwithstanding the breach [of a contract to install lath], an award of net profit would put the party only where it would have been had the contract never been secured."); *Coast Trading Co. v. Parmac, Inc.*, 21 Wash.App. 896, 587 P.2d 1071 (1978) (loss of order to manufacture steel bolted storage tanks amounting to twenty-five to thirty percent of plaintiff's anticipated annual sales did not cause any reduc-

tion in plaintiff's work force or other savings in overhead costs so that no allocable share of plant "burden" or overhead need be deducted in computing lost profit).

There are cases to the contrary. For example, in *Pahokee Housing Authority v. South Florida Sanitation Co.*, 478 So.2d 1107 (Fla.Dist.Ct.App.1985), a housing authority of 400 units breached the exclusive garbage franchise it had awarded to the plaintiff. The franchise holder contended that all of its employees had remained in its employ and that all of its equipment had to be maintained despite the breach. The trial court accepted that the overhead was fixed and did not deduct it in calculating damages. The intermediate appellate court thought the award constituted "an unmerited windfall," *id.* at 1108, and allowed the plaintiff only that percentage of the contract price which equaled the general profit margin of the plaintiff as reflected on its income tax return for the relevant year.

In our view the cases holding that reasonable, fixed expenses need not be deducted from gross income to arrive at lost profit properly recoverable are more persuasive. They are also the weight of authority. *See* R. Dunn, *Recovery of Damages for Lost Profits* § 6.5, at 290 (3d ed. 1987).

Sloane's argument emphasizes *Partridge v. Norair Eng'g Corp.*, 301 F.2d 247 (D.C.Cir.1962) for the proposition that at least 1,693 hours worth of the salaries and salary costs of the House employees who would have worked on the Sloane account must be allocated to cost of performance. In *Partridge* the plaintiff partnership agreed to furnish a mechanical engineer to the defendant, a general contractor, for one year at $7.50 per hour of the engineer's time. This price also included all necessary supervision of the engineer by a partner of the plaintiff. Upon breach by the defendant the plaintiff claimed lost profit computed at $3.272 per hour representing $7.50 per hour less the engineer's salary and salary costs of $4.228 per hour. The trial court found, however, that a partner had been averaging four hours per day in supervision and that the "value of the

supervision time" was $7.50 per hour or $3.75 per hour per eight hour day. *Id.* at 250. Because $7.978 ($4.228 + $3.75) exceeded $7.50, the trial court found that the plaintiff had contracted for a loss and awarded no damages on the lost profits claim. A three judge panel of the appellate court affirmed, with a dissent. The majority considered supervision a cost of performing the contract to be deducted from the contract price just as the salary and benefits paid to and for the engineer were to be deducted. *Id.* at 251. The dissenting judge pointed out that the value of the partner's time was not an out-of-pocket cost or expenditure which the partnership would have incurred in fulfilling the contract. *Id.* at 253. He further pointed out that if the majority's theory were valid it would mean that whenever the value of a partner's time equaled the contract price there could be no recovery because there would be no difference between selling price and cost. *Id.* at 254.

We are not here concerned with that aspect of *Partridge* involving work performed by a partner when computing lost profit damages claimed by a partnership. With respect to employee costs, the engineer assigned to the contract in *Partridge* was required by that contract to work exclusively for the defendant. Breach of the contract obviously freed him to work on one or more other contracts. Requiring his salary and costs to be deducted simply put the *Partridge* plaintiff in the position that it would have been in had the contract been performed. In the case before us the trial court accepted that House, using basically its existing personnel, could have performed both the Sloane contract and all of its other work. Under those facts House had no significant savings as a result of Sloane's breach. Therefore, requiring House to allocate to the Sloane contract part of the cost of those who would have worked on it does not put House, as a lost volume seller of services, in as good a position as it would have occupied had the Sloane contract been performed.

Finally, Sloane also argues that House's proof failed because it did not prove that the Sloane contract would have

been a profitable one, *i.e.,* that it would have produced a net profit after deducting variable costs *and* an allocated portion of fixed costs. Under the applicable theory it is immaterial how much of the damage award represents net profit, if any, and how much represents recovery of so much of the contract price as would have been used to offset fixed costs.

## II

Sloane also appeals the award of $14,832.24 as counsel fees pursuant to the contract provision for reasonable attorney's fees. The amount of time actually expended by House's counsel on the case was not directly proved and the fee agreement between House and its counsel called for a one-third contingent fee. At trial House called as an expert witness an attorney who was experienced in litigation involving commercial disputes. That attorney opined that a contingent fee of 25% to 33⅓%, or perhaps higher, of the amount recovered would be reasonable. In colloquy with counsel immediately following receipt of this evidence, the trial judge expressed concern about awarding a contingent fee in addition to any amount recovered. He ended the colloquy by observing that, if the issue of counsel fee were reached, "it is going to be a question of ... what I consider to be reasonable." Sloane produced no evidence on counsel fees at trial.

In his oral opinion the circuit judge found that "one-third is an inordinate amount, and that 20 percent is the more appropriate measure of damages." Clarifying the prior discussion with counsel, he ruled that his award was to be in addition to the judgment of $74,161.21. He then undertook some oral, mental arithmetic and commented that the fee would be twice whatever $7,416.12 would be. The docket entry of the judgment specifies that it includes "attorney's fees in the amount of 20% of $74,161.21 additionally and costs."

In its post-judgment motion, Sloane did not seek an opportunity to factually show that the amount of the fee was unreasonable. Starting from the premise that the trial

court awarded a contingent fee the defendant argues that a fee may not be awarded against a losing party which is to be paid both at contingent fee rates and in addition to the recovery on which it is computed. That issue is not presented by the record. In substance the trial court concluded that a reasonable fee was $14,832.24.

█ Here the amount of counsel fees awarded is supported by the trial judge's knowledge of the professional services involved in preparing and presenting the case before him. *See Kline v. Chase Manhattan Bank*, 43 Md. App. 133, 145–46, 403 A.2d 395, 402 (1979); *Estate of Settle v. Holmes*, 97 Ill.App.3d 552, 555, 52 Ill.Dec. 799, 802, 422 N.E.2d 1008, 1011 (1981); *Hanson v. Hanson*, 378 N.W.2d 28, 31 (Minn.Ct.App.1985); *Canaday v. Canaday*, 467 N.E.2d 783, 785 (Ind.Ct.App.1984). *See also Deer Creek Constr. Co. v. Peterson*, 412 So.2d 1169, 1173 (Miss.1982); *Ross v. Sheriff of Lafourche Parish*, 479 So.2d 506, 513 (La.Ct.App.1985); *Zebrowski and Assoc. v. Indianapolis*, 457 N.E.2d 259, 264 (Ind.Ct.App.1983).

### III

House has cross-appealed. The judgment entered at the conclusion of trial on July 31, 1986, specified that it carried interest on $74,161.21 from July 9, 1984. Thereafter, in response to Sloane's post-judgment motion, the court struck the prejudgment interest feature from the judgment.

█ The subject of prejudgment interest was extensively reviewed in *I.W. Berman Properties v. Porter Bros.*, 276 Md. 1, 344 A.2d 65 (1975). Generally, prejudgment interest is a matter left to the discretion of the court when sitting as a jury. *Id.* at 18, 344 A.2d at 75. This Court has, on occasion, reversed a trial judge's discretionary determination not to allow prejudgment interest, but in those instances the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed

amount as of a known date. *See Atlantic States Constr. Co. v. Drummond & Co.*, 251 Md. 77, 85, 246 A.2d 251, 255 (1968); *Affiliated Distillers Brands Corp. v. R.W.L. Wine & Liquor Co.*, 213 Md. 509, 519, 132 A.2d 582, 586 (1957). In the instant matter the amount due to House was not liquidated until judgment. We shall not disturb the trial judge's decision on interest.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID TWO-THIRDS BY APPELLANTS AND CROSS-APPEL-LEES AND ONE-THIRD BY APPELLEES AND CROSS-APPELLANTS.