AD–VANTAGE TELEPHONE DIRECTO-
RY CONSULTANTS, INC., Plaintiff–
Appellant, Cross Appellee,

v.

GTE DIRECTORIES CORPORATION,
Defendant–Appellee, Cross–
Appellant.

No. 90–3410.

United States Court of Appeals,
Eleventh Circuit.

Oct. 9, 1991.

Jawdet I. Rubaii, Clearwater, Fla., John R. Ferguson, Paul J. Kaleta, Swidler & Berlin, Washington, D.C., for plaintiff-appellant, cross-appellee.

James J. Kenny, Richard Alan Arnold, William J. Blechman, Kenny, Nachwalter & Seymour, Miami, Fla., for defendant-appellee, cross-appellant.

Before FAY and COX, Circuit Judges, and MORGAN, Senior Circuit Judge.

FAY, Circuit Judge:

The parties in this case have let their fingers do the walking in court since 1982. Previously, this court affirmed a jury verdict in favor of the Plaintiff–Appellant, Ad–Vantage Telephone Directory Consultants, Inc. (*"Ad–Vantage"*), and against Defendant–Appellee, GTE Directories Corporation ("GTEDC"), for intentional interference with advantageous business relationships. *Ad–Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.,* 849 F.2d 1336 (11th Cir.1987) ("Ad–Vantage I"). We reversed, however, the jury's award of $1.5 million in compensatory damages for that claim, and remanded the case for a retrial expressly limited to the amount of compensatory damages due Ad–Vantage. *Id.* At retrial, the district court[1] directed a verdict against Ad–Vantage, reinstated a $500,000 punitive damage award against GTEDC from the first trial, and setoff GTEDC's counterclaim judgment for $208,000 against the punitive damages award for a net judgment against GTEDC of $292,000 with interest. After nine years of litigation, we remand this case to the district court for yet another trial. For the reasons that follow, we AFFIRM the judgment of punitive damages subject to the setoff against GTEDC, REVERSE the directed verdict, and REMAND the case again for a determination of the amount of compensatory damages due Ad–Vantage.

## I. BACKGROUND

This case concerns the business of yellow pages advertising in telephone directories. Defendant GTEDC is a publisher of telephone directories and a member of the National Yellow Pages Service Association ("NYPSA"),[2] a yellow pages trade organization. Plaintiff Ad–Vantage, a subchapter S corporation,[3] was a NYPSA Authorized Selling Representative ("ASR"). ASRs sell yellow pages advertising to "national accounts," as defined by NYPSA, for placement in yellow pages directories, such as those published by GTEDC.

Ad–Vantage originally sued GTEDC for monopolization and attempt to monopolize under federal and state law, intentional breach of unidentified agreements, breach of contract, and intentional interference with advantageous business relationships. GTEDC counterclaimed for $208,000 owed for advertising purchased in GTEDC directories on orders submitted on behalf of specific advertisers.[4] The district court directed a verdict in GTEDC's favor on Ad–Vantage's claim for intentional breach of unidentified contracts. The jury later returned a verdict for GTEDC on the breach of contract claim and the antitrust claims under the Sherman Act. The jury, however, returned a verdict for Ad–Vantage on

---

1. The parties consented to a jury trial before a United States Magistrate Judge. GTEDC moved to withdraw its consent to have a Magistrate Judge preside over the post-remand proceedings. The Honorable George C. Carr, United States District Judge, denied the motion. United States Magistrate Judge Thomas G. Wilson conducted all proceedings, presided over both trials, and entered orders after August 17, 1983, the date of the written consent.

2. NYPSA subsequently changed its name to YPPA—Yellow Pages Publishers Association.

3. As we explained in *Ad–Vantage I,* the subchapter S form is available to small corporations that meet the requirements for such corporations. In a subchapter S corporation, the income of the corporation is treated as personal income of the stockholders. The corporation thereby avoids the corporate "double tax," where the corporation is taxed on its income and the individual stockholders are also taxed on their stock dividends. 849 F.2d at 1352; *see generally* 26 U.S.C. §§ 1361–79 (1982).

4. For a thorough review of the facts underlying the original claims, see *Ad–Vantage I,* 849 F.2d at 1338–40.

its Florida antitrust claims and on the interference claim. Ad–Vantage was awarded $1.5 million in damages, not differentiated between claims, and punitive damages of $500,000 on the interference claim.

On appeal, this court reversed the antitrust verdict, instructing the district court to grant GTEDC's motion for a judgment notwithstanding the verdict ("JNOV") on all the antitrust claims. *Ad–Vantage I,* 849 F.2d at 1348. We affirmed the district court's denial of GTEDC's motion for a directed verdict or for a JNOV on Ad–Vantage's claim for interference with an advantageous business relationship. *Id.* at 1349, 1350, 1353. We also ruled, however, that Ad–Vantage's evidence of damages was legally insufficient under Florida law and remanded for retrial the sole issue of the amount of compensatory damages due Ad–Vantage. *Id.* at 1350–53. Because this second appeal turns on the application of our mandate regarding calculation of the appropriate amount of compensatory damages due Ad–Vantage, we review the proceedings on this issue and revisit relevant Florida law.

## A. The First Trial

The dispute between Ad–Vantage and GTEDC stemmed from alleged collection problems. GTEDC claimed Ad–Vantage failed to pay its account on time and that several of Ad–Vantage's checks were worthless. Consequently, GTEDC bypassed Ad–Vantage and directly billed Ad–Vantage's clients. Ad–Vantage sued, claiming that as a result of GTEDC's direct contact with its clients, Ad–Vantage lost several major accounts, and ultimately went out of business.[5] During the first trial, Ad–Vantage claimed GTEDC interfered with forty-six, specifically identified accounts.[6]

In order to show lost profits on these accounts, Ad–Vantage presented the expert testimony of Mr. David Salverson, a certified public accountant who reviewed Ad–Vantage's books and records. Using 1982 as the base year, Mr. Salverson computed the gross sales revenue for each of the forty-six accounts and then deducted the full amount due publishers. He also deducted any discount that Ad–Vantage gave to the client, together with the commissions that Ad–Vantage paid its salespersons. From these calculations, Mr. Salverson derived the operating profit on each account. The operating profit for each of the forty-six accounts was then added together to obtain the gross operating profit for all forty-six accounts. To this 1982 base year profit, Mr. Salverson applied a growth rate of approximately twenty percent per year to project future lost profits for a ten year period. From the resulting amounts for each year, Mr. Salverson deducted the entire amount of Ad–Vantage's overhead expenses, including salaries paid to clerical help, to arrive at Ad–Vantage's projected profits for each of these years on the lost profits.

Mr. Salverson, however, did not deduct any salary or compensation for Mr. Joel Blumberg, the manager and sole stockholder of Ad–Vantage, contrary to the general rule in Florida that a corporation, in proving the amount of lost profits, must deduct the expense of salaries paid to its officers. *Southern Bell Tel. & Tel. Co. v. Kaminester,* 400 So.2d 804, 807 (Fla. 3rd DCA 1981). Ad–Vantage argued that the rule could not possibly apply to subchapter S corporations because subtracting the net profits paid to a stockholder of a subchapter S corporation as an expense would always produce a net profit of zero.

GTEDC vigorously objected to Ad–Vantage's damage study and its failure to deduct a salary figure for Mr. Blumberg. GTEDC extensively cross-examined Mr. Salverson. GTEDC also introduced the expert testimony of Mr. James Smith IV and

---

5. Ad–Vantage reincorporated under the name "National Yellow Pages Directories Services." In 1982, NYPSA stripped Ad–Vantage of its status as an ASR for failure to pay several of its publishers. NYPSA later admitted National as an ASR, only to expel the company for nonpayment of bills in 1985.

6. Initially, Ad–Vantage claimed that GTEDC interfered with 99 accounts. However, Mr. Blumberg, Ad–Vantage's sole shareholder, transferred 53 of those accounts to his new company, National Yellow Pages Directories Services, Inc. At trial, Ad–Vantage withdrew a damage study including these 53 accounts and replaced it with one composed of the 46 remaining accounts.

Dr. John Deiter to rebut Ad–Vantage's damage studies. Dr. Deiter testified that Ad–Vantage's damage study remained flawed until a reasonable manager's salary for Mr. Blumberg reflecting the value of his services as office manager was deducted as an expense. Significantly, Dr. Deiter testified that $25,000 would be a reasonable salary for these services. At the close of argument, the jury returned a verdict for Ad–Vantage on its claims for intentional interference with advantageous business relationships and monopolization under Florida antitrust law and awarded $1.5 million in compensatory damages.[7]

### B. Mandate of *Ad–Vantage I*

GTEDC appealed, arguing that Ad–Vantage's damage study was insufficient under Florida law because it failed to deduct Mr. Blumberg's salary as office manager and to account for the large sums of money withdrawn by Mr. Blumberg from Ad–Vantage as personal income. *Ad–Vantage I*, 849 F.2d at 1351. Mr. Blumberg's K–1 form for 1982—the year of the claimed interference and the base year for Mr. Salverson's damage calculations—revealed that he received $448,984 of income as sole shareholder of Ad–Vantage. Moreover,

> Mr. Blumberg's testimony indicated that he drew money out of Ad–Vantage's account when he needed it "to live on." He also testified that in 1982 more than $100,000 of the $448,984 which showed up as income on his K–1 form for 1982 was taken directly out of Ad–Vantage's corporate account to pay his personal losses in the commodities market.

*Id.* at 1352. GTEDC asserted that Ad–Vantage did not show what amount of the $448,984 represented Mr. Blumberg's salary, that under Florida law a salary must be prorated as an expense, and therefore the net profit figure offered by Ad–Vantage was insufficient. *Id.* at 1351–53.

Our review of this issue began with the standard of proof for lost profits under Florida law:

> To recover anticipated lost profits in Florida, a plaintiff must demonstrate

such a loss with reasonable certainty by competent proof. The expenses incurred to produce the net profits must be established in specific dollar amounts. *In addition, Florida law expressly requires that a corporation, in proving the amount of lost profits, must deduct the expense of salaries paid to its officers.*

*Id.* at 1351 (citations omitted) (emphasis added). We noted that the strictness of the last rule was made clear in *Southern Bell Telephone & Telegraph Co. v. Kaminester*, 400 So.2d 804 (Fla. 3rd DCA 1981). *Ad–Vantage I*, 849 F.2d at 1351. In *Kaminester*, a jury awarded a professional association, whose principal employee and sole officer was a dermatologist, lost profits after it found Southern Bell liable for incorrectly listing the doctor's address in the 1977 Hobe Sound–Jupiter Yellow Pages. 400 So.2d at 805. Southern Bell appealed, arguing that the professional association failed to deduct the doctor's compensation in computing net profits, rendering the proof of lost profits inadequate. *Id.* at 807. The third district court agreed, rejecting the argument that "when [a] corporation is a professional association whose officer is a physician, an exception should be made to the general rule that a showing of loss of net profits requires a corporation to deduct the compensation paid to its officer." *Id.*

Finding *Kaminester* controlling, we rejected Ad–Vantage's assertion that an exception to the general rule must be made for subchapter S corporations. *Ad–Vantage I*, 849 F.2d at 1352–53. Although we acknowledged the illogic of subtracting the net profits paid to a stockholder of a subchapter S corporation as an expense "because such a procedure would always produce a net profit of zero," we noted that such would not hold true for Ad–Vantage. *Id.* at 1352. Mr. Blumberg's 1982 K–1 form indicated he received $448,984 as income because of his status as sole stockholder of Ad–Vantage, but there was "no evidence at trial to indicate that this figure represented Ad–Vantage's net profits for 1982." *Id.* More importantly, there was no evidence offered "to indicate *what*

---

**7.** GTEDC urged the district court to use special interrogatories. The district court denied the request as untimely—defense counsel made the request at the jury charge conference without prior serving the interrogatories to the court or plaintiff's counsel.

*amount* of the $448,984 declared as income to him was represented as expenses on the damage study used to show lost profits." *Id.* (emphasis added).

Lastly, we noted that Mr. Blumberg wore two hats: one as the sole stockholder of Ad–Vantage; the other as Ad–Vantage's manager (Mr. Blumberg also wore a third hat—as the company's principal salesperson). As Ad–Vantage's manager, he earned a salary for his services, *whether or not he actually drew a regularly scheduled predetermined amount.* Indeed, "[t]he salary was flexible, it was up to him to determine how much, but it represented money taken out of the corporation without regard to the actual profit that the corporation, *i.e.,* Mr. Blumberg as shareholder, was making." *Id.* Some portion of Mr. Blumberg's 1982 flexible withdrawals represented his earnings as manager. Ad–Vantage, however, never showed, in any of its proffered damage studies, what amount of the $448,984 composed Mr. Blumberg's salary as manager—an amount *Kaminester* requires be prorated as an expense. Accordingly, we ruled:

> The law of Florida makes the *exact* amount of Mr. Blumberg's salary, to the extent it differed at all from Ad–Vantage's net profits, a relevant factor. While we cannot say that Ad–Vantage failed to prove that it was damaged at all, the evidence was insufficient to justify the jury's verdict. Thus, we must remand for a new trial on the amount of damages sustained as a result of GTEDC's tortious interference with Ad–Vantage's advantageous business relations.

*Id.* at 1353 (footnote omitted) (emphasis added).

### C. The Second Trial

Extensive pretrial proceedings and discovery characterized the proceeding after remand.[8] The point of contention that would lead to this appeal became evident when the parties exchanged pretrial statements identifying their expert witnesses. Ad–Vantage identified Mr. David Salverson, who again would calculate Ad–Vantage's lost profits, and Mr. Stephen Christodahl, a certified personnel consultant, who would testify about a "reasonable manager's salary" for Mr. Blumberg. Upon receipt of Ad–Vantage's expert statement, GTEDC immediately moved to exclude evidence on retrial of a hypothetical salary, arguing that this court's use of the word "exact" in its mandate meant Mr. Blumberg's "actual" salary and not the reasonable value of his services. The district court denied the motion, stating:

> It is [Ad–Vantage's] position ... that Blumberg did not *actually* receive a salary and that the determination of his salary must be based on other evidence. [GTEDC] has failed to establish that [Ad–Vantage] is barred from presenting any evidence on the issue other than an "actual" salary. [Ad–Vantage's] evidence, of course, must relate to Blumberg's services. Whether [Ad–Vantage] satisfactorily ties [the] purported salary with Blumberg's services can be determined only after a presentation of the evidence.

(R9:283) (emphasis added). GTEDC moved for reconsideration of this ruling. The motion was denied.

Two years after the issuance of the mandate, the retrial began expressly limited to the question of the amount of compensatory damages due Ad–Vantage. At the close of opening statements, just prior to the testimony of Mr. Christodahl, the district court expressed concern that a "reasonable manager's salary" would not fulfill our mandate requiring the "exact" amount of Mr. Blumberg's salary.[9] The district court stated that Ad–Vantage's damage study

---

8. The pretrial motions principally addressed damage causation, the scope of discovery, and the need for continuances.

9. ... THE COURT: Now, before the jury comes in, it's my understanding, Mr. Ferguson, you're going to bring in the first witness, [relating] to a reasonable manager's salary; is that it?

MR. FERGUSON: [counsel for Ad–Vantage] Yes, sir.

THE COURT: And not Mr. Salverson's salary?

MR. FERGUSON: No, sir. The appeal went up, as Your Honor will recall, a claim made here in this Court that there was no inclusion of [a] reasonable manager's salary.

Dr. Deiter was then—as an expert—testified that should be $25,000. Our argument was, we

would have to deduct Mr. Blumberg's actual salary or else "[t]he case goes down the tube...." Despite the district court's admonition, Ad–Vantage proceeded with its theory of the case, having Mr. Christodahl testify that a reasonable manager's salary for Mr. Blumberg ranged from $22,000 to $25,000.

Ad–Vantage then introduced its seventh post-remand damage study through Mr. Salverson. Mr. Salverson calculated gross revenues for each account in 1982 based upon the available books and records of Ad–Vantage.[10] He then deducted the full amount owed to the individual publishers, the discount afforded the client, and salesmen commissions. The resulting profit for each client was projected for each year for the next ten years using a growth rate from actual client records or industry sources. Mr. Salverson then deducted Ad–Vantage's operating or overhead expenses, increased by the annual consumer price index, from the total projected profits for each year. The net profits for the ten year period were reduced to present value.

Although Ad–Vantage's damage model reflected considerable new data since the first trial, the methodology for calculating lost profits remained exactly the same. Unlike the first trial, however, Ad–Vantage deducted a commission for each account that had been sold by Mr. Blumberg and a $25,000 reasonable manager's salary to conform to its understanding of our mandate. Ad–Vantage also reduced the growth rate from twenty to eighteen percent and prorated its expenses to only re-

---

feel if there had to be such inclusion, that had been provided by Dr. Deiter. [The] Court of Appeals didn't buy it and said that we had to include [it] as the appeal by defendants, assert[ing] some amount for reasonable manager's salary.

THE COURT: *That isn't what they said. They used the word "exact salary." Used the word "exact." And there's been a motion previously filed to exclude it. And my response was, until I hear it, I can't exclude it. And here we are. We're staring it right in the face.*

\* \* \* \* \* \*

MR. ARNOLD: [counsel for GTEDC] They have to either come up with the exact amount of Mr. Blumberg's salary or we'll be making a motion for Directed Verdict.

THE COURT: That is what I thought. Let's assume this is excluded, is there anything, something else you could put on?

MR. FERGUSON: Your Honor, Mr. Blumberg was not paid a salary as such. He was paid dividends.

THE COURT: I understand that. The Court of Appeals didn't totally buy that.

MR. FERGUSON: Your Honor, that didn't come up in the first trial.

THE COURT: It came up on appeal. What I'm trying to do ... is figure out what they want me to do, and the way they construed Florida Law.

And the way I read it, they were talking about his salary, and there was some evidence that he took—his salary, in essence, was everything they made.

\* \* \* \* \* \*

MR. KALETA: [counsel for Ad–Vantage] Your Honor, if I may, as your order recognized ... you noted Mr. Blumberg did not have— there was no way to show an exact salary in terms of the business records because he didn't take a salary.

. . . .

But what Mr. Christodahl's testimony will do is indicate some portion of that amount, which will represent an expense as an officer's salary.

... That's the way we viewed—that is the key to the equation, the puzzle that the 11th Circuit really gave us. The question is, what was the reasonable value of the services? ...

THE COURT: *Well, that isn't it, no. It isn't the reasonable value of services. You have to deduct what his salary was. If he took an unreasonable salary, you've got to deduct it.*

MR. ARNOLD: Exact amount—

MR. KALETA: *But, Your Honor, there's no salary.*

\* \* \* \* \* \*

THE COURT: And we'll put [Mr. Christodahl's testimony] on and see how far it goes in the presence of the jury the first time. I understand you have an objection.

MR. ARNOLD: Okay, that's fine.

THE COURT: I know you have an objection. You filed a motion on it and I said I'll wait and hear what they have to say.

MR. ARNOLD: We agree to that, with the caveat that we didn't want him to start out.

THE COURT: I understand. I have to hear the guy. But I can tell you, I'm troubled by it. For example, it says, the law of Florida makes the exact amount of Mr. Blumberg's salary to the extent it differed at all from Ad–Vantage's net profits a relevant factor.

MR. KALETA: Your Honor, in subchapter S corporations, it's impossible.

THE COURT: *Well, then maybe in subchapter S you can't recover net profits in Florida.* (R48:36–42).

10. On cross-examination, Mr. Salverson acknowledged using records from 1979, 1980, 1981, and 1983 on certain accounts because records for 1982 were missing for those clients.

flect losses on the forty-six specific accounts.

At the close of Ad–Vantage's case, GTEDC moved for a directed verdict on the grounds that Ad–Vantage's damage study was insufficient because it failed to take into account the actual salary or other compensation paid Mr. Blumberg in 1982.[11] The district court agreed, stating:

> The court of appeals held that "[t]he law of Florida makes the exact amount of Mr. Blumberg's salary, to the extent it differed at all from Ad–Vantage's net profits, a relevant factor." Similarly, the court noted that "Mr. Blumberg's salary must be prorated as an expense". These statements, as well as the court's entire discussion on the issue, make clear that what must be deducted in computing damages was the compensation paid to Blumberg.
>
> *[Ad–Vantage], however, simply presented evidence of the value of Blumberg's services as a manager. There was no evidence of the amount of compensation Blumberg actually received for his services.* As a result, the plaintiff's evidence of damages is again legally insufficient.

(R17:477) (citations omitted) (emphasis added). We now reverse and remand.

## II. DISCUSSION

### A. Ad–Vantage's Appeal

In *Litman v. Massachusetts Mutual Life Insurance Co.*, 825 F.2d 1506, 1511 (11th Cir.1987) (en banc), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 652 (1988), we noted "[a] mandate may be vague or precise resulting from the disposition of those issues presented which vary widely from the rather simple to the most complex. Determining the scope of a mandate can present problems with interpretation." Although this is not a dispute about the "relationship between the appellate courts and district courts," *id.*, we are called upon to review the district court's interpretation of our mandate regarding Ad–Vantage's burden in presenting evidence of Mr. Blumberg's salary. The issue is one of law and we have plenary review. *See id.* at 1512.

GTEDC contends that our mandate requiring Ad–Vantage to establish "the *exact* amount of Mr. Blumberg's salary," *Ad–Vantage I*, 849 F.2d at 1353 (emphasis added), compelled Ad–Vantage to show proof of an *actual* amount, and because Ad–Vantage did not, a directed verdict was in order. The district court agreed. It is true that we determined that Mr. Blumberg took a salary, that his salary had not been disclosed, and that it had to be disclosed in specific dollar amounts to meet the requirements of Florida law. *Id.* at 1350–53. This was the essence of our mandate. We do not read Florida law, however, to require an *actual* salary be deducted where, as here, no salary was actually paid.

In *Ad–Vantage I*, we relied on *Southern Bell Telephone & Telegraph Co. v. Kaminester*, 400 So.2d 804 (Fla. 3rd DCA 1981), as controlling; it remains controlling today. In *Kaminester*, the third district court held that a corporation must deduct salaries paid to its officers as expenses when proving lost profits. *Id.* at 807. The court also rejected an exception to this rule for professional associations. *Id.* In so holding, the court relied solely on *Partridge v. Norair Engineering Corp.*, 301 F.2d 247 (D.C.Cir.1962). *Kaminester*, 400 So.2d at 807. *Norair* involved the calculation of lost profits for a partnership for breach of contract. The court in *Norair* held that where a partnership seeks lost profits for breach of contract, the partnership must deduct the *value* of the partner's services in administering the contract.[12] 301 F.2d at 251.

> It is generally recognized that the value of the plaintiff's own services, or, if the plaintiff be a corporation, of the services of its officers, not rendered because of a breach of contract, is a part of the cost of perform-

---

11. GTEDC also moved for a directed verdict on the grounds that the damage model was based on mere speculation, that there was no evidence of causation, and that Ad–Vantage did not mitigate its damages. The district court rejected these arguments and we do not consider them.

12. In the A.L.R. annotation to the case just discussed, it is said, 50 A.L.R. at page 1398:

■ As we noted in *Ad–Vantage I,* Florida law requires that the plaintiff prove lost profits to a "reasonable certainty." 849 F.2d at 1351. Recently, in a case interpreting Florida law, we held that lost profits may be based on reasonable estimates. In *Electro Services, Inc. v. Exide Corp.,* 847 F.2d 1524 (11th Cir.1988), an automobile battery distributor sued a battery manufacturer for providing defective merchandise and for other tortious conduct. The jury awarded the plaintiff $145,509 for lost profits. *Id.* at 1527. The defendant appealed, arguing the evidence did not support the award. *Id.* We disagreed, concluding:

> that the evidence supports the jury's award for lost profits. In the landmark case of *Twyman v. Roell,* 123 Fla. 2, 166 So. 215, 218 (1936), the Florida Supreme Court stated that "[t]he uncertainty which defeats recovery in [lost profit] cases has reference to the cause of the damage rather than the amount of it." *Twyman* indicates that "uncertainty as to the amount of damages or difficulty in proving the damages will not prevent recovery if it is clear that substantial damages were suffered as a result of the wrong. Inability to give the exact or precise amount of damages does not preclude recovery...."
>
> Consequently, "[i]f from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person." *Twyman,* 166 So. at 218. "The requisite to ... allowance [for lost profits] is some standard, such as regular market values, or other established data, by reference to which the amount may be satisfactorily ascertained."

847 F.2d at 1527 (citations omitted). The Florida Supreme Court reaffirmed the rule of *Twyman* in *W.W. Gay Mechanical Contractor, Inc. v. Wharfside Two, Ltd.,* 545

So.2d 1348, 1350–51 (Fla.1989) ("if there is a 'yardstick' by which prospective profits can be measured, they will be allowed if proven"). Therefore, because the original jury found GTEDC liable for tortious interference with business relationships, Ad–Vantage on remand may offer proof of the extent of damages with evidence that is indirect and based on estimates and assumptions, " 'so long as the assumptions rest on adequate data.' " *G.M. Brod & Co. v. U.S. Home Corp.,* 759 F.2d 1526, 1539 (11th Cir.1985) (quoting *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 668 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975)).

Based on Mr. Christodahl's estimate, Ad–Vantage deducted the value of Mr. Blumberg's services as manager because no salary for these services had actually been paid. This approach is consistent with *Twyman* and *Kaminester's* instructive reliance on *Norair. See also Klamath–Orleans Lumber, Inc. v. Miller,* 87 Cal. App.3d 458, 151 Cal.Rptr. 118 (1978) (the value of bookkeeping services must be deducted from net profits when calculating damages); *Carrey v. Boyes Hot Springs Resort, Inc.,* 245 Cal.App.2d 618, 54 Cal. Rptr. 199 (1966) (the value of personal services rendered to the business by its owners must be taken into account when calculating net profits).

Our mandate indeed required that an "exact" salary be deducted as an expense. An exact salary means either an actual salary, or where no salary is actually paid but where services are rendered, a specific dollar amount, *E.T. Legg & Assocs. v. Shamrock Auto Rentals, Inc.,* 386 So.2d 1273, 1274 (Fla. 3rd DCA 1980), *review denied,* 392 So.2d 1379 (Fla.1981), extrapolated from competent proof. *Polyglycoat Corp. v. Hirsch Distrib., Inc.,* 442 So.2d 958, 959 (Fla. 4th DCA 1983), *review dismissed,* 451 So.2d 848 (Fla.1984). Ad–Van-

---

ance, and, as such, is a deductible item in computing damages for the breach.

　　\*　　\*　　\*　　\*　　\*　　\*

The principle stated above is thus well established and seems to us to be sound. We follow it, therefore, and hold that the value of the Partridge partner's supervisory service

was an element in the partnership's cost of meeting its contractual obligations and ... should be deducted from the gross price of $7.50 in determining the profit, if any, which would have resulted from the completion of the term.

*Norair,* 301 F.2d at 251 (footnote omitted).

tage deducted as an expense the specific dollar amount of $25,000 as a reasonable salary for Mr. Blumberg's services as manager. GTEDC cross-examined Mr. Christodahl on how he arrived at his estimate. Ad–Vantage also deducted in specific dollar amounts the commissions Mr. Blumberg earned as a salesperson. GTEDC cross-examined Mr. Salverson on how he calculated these commission amounts and the total lost profit number. Contrary to the district court's ruling, Ad–Vantage offered proof of Mr. Blumberg's compensation for his services, to the extent it differed at all from Ad–Vantage's net profits, in exact amounts in accord with our mandate. Had the trial proceeded, the jury would have been free to weigh the evidence.

GTEDC makes the circular argument that Ad–Vantage must provide the actual amount of Mr. Blumberg's salary to meet the mandate, but Ad–Vantage cannot do so because Mr. Blumberg did not draw an actual salary, and thus the mandate cannot be met. It is facially absurd to require the deduction of an actual salary where none exists. As Ad–Vantage correctly points out, such a rule would render it impossible for subchapter S corporations or partnerships to ever recover lost profits since subchapter S stockholders and partners are often not paid salaries. Rather, they are compensated by the stream of income generated by the corporation or partnership. There is nothing necessarily sinister about not taking an actual salary as a subchapter S shareholder or as a partner. But under Florida law, where services are rendered, the value of those services must be deducted when computing lost profits. *Kaminester*, 400 So.2d at 807.

*Ad–Vantage I* turned on the issue of whether Mr. Blumberg's salary had to be deducted at all, not on *how* that salary should be determined. We reject GTEDC's argument that we decided by *necessary implication* that a hypothetical reasonable manager's salary would be insufficient. Nowhere in *Ad–Vantage I* did we address *how* to determine Mr. Blumberg's salary or refer to a "reasonable manager's salary." Nor did our denial of Ad–Vantage's Peti-

tion for Rehearing with Suggestion of Rehearing En Banc, in which Ad–Vantage asserted that Dr. Deiter's testimony had cured the legal insufficiency of the damage model, dispose of the issue of whether a damage study introduced by Ad–Vantage actually reflecting the deduction would have been sufficient.

■ Lastly, the district court held in the alternative that assuming our mandate permitted Ad–Vantage to value Mr. Blumberg's services, "the specific evidence of reasonable value in this case is deficient [because] the evidence does not establish that the $25,000 salary ascribed to Blumberg covers *all* of his duties and responsibilities." (R17:477) (emphasis added). In *Ad–Vantage I*, we noted that Mr. Blumberg wore two hats: one as the sole stockholder and one as manager. 849 F.2d at 1352. He also wore a third hat as the company's principal salesperson. As the sole stockholder, he earned dividends. As a manager, he furnished services that had a value. As a salesperson, he contributed talents and services equal to those of other salespersons to whom commissions were paid. His services to the company came in his capacities as manager and salesperson. On remand, Ad–Vantage offered proof of the value of Mr. Blumberg's services. If Mr. Blumberg had not rendered these services, the corporation would have been forced to purchase them on the open market. Ad–Vantage deducted the value of Mr. Blumberg's services as expenses as required by Florida law. GTEDC remained free to challenge the credibility of the evidence or to offer its own.

Having examined all the evidence in the light most favorable to Ad–Vantage, we find that the facts and inferences do not point so strongly and overwhelmingly in favor of GTEDC that reasonable men could not arrive at a contrary verdict. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969).[13] Accordingly, we reverse the directed verdict and remand for a determination of the amount of compensatory damages due Ad–Vantage.

13. The Eleventh Circuit in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

## B. GTEDC's Cross–Appeal

■ The original jury awarded Ad–Vantage $1.5 million in compensatory damages and $500,000 in punitive damages. *Ad–Vantage I*, 849 F.2d at 1353. We remanded for a new trial on the amount of compensatory damages but affirmed the punitive damage award. *Id.* We held, however, that "the punitive damage award may stand, *providing that the jury on remand determines that Ad–Vantage is entitled to at least nominal damages." Id.* (emphasis added); *see Lassiter v. International Union of Operating Engineers,* 349 So.2d 622, 626 (Fla.1976). At the close of the second trial, the district court reinstated the punitive damage award subject to a setoff of $208,000. GTEDC cross-appeals the district court's reinstatement on the grounds that the second jury, on remand, never determined that Ad–Vantage was entitled to damages.

As we noted in *Piambino v. Bailey,* 757 F.2d 1112, 1119 (11th Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986), "[a] trial court, upon receiving the mandate of an appellate court, may not alter, amend, or examine the mandate, or give any further relief or review, but must enter an order in strict compliance with the mandate." We further noted:

> The "mandate rule," as it is known, is nothing more than a specific application of the "law of the case" doctrine. This doctrine stands for the proposition that an appellate decision on an issue must be followed in all subsequent trial court proceedings unless the presentation of new evidence *or an intervening change in the controlling law* dictates a different result, or the appellate decision is clearly erroneous and, if implemented, would work a manifest injustice.

*Id.* at 1120 (citations omitted) (emphasis added). Here, the district court recognized an intervening change in controlling law and properly reinstated the punitive damage award.

In *Ault v. Lohr,* 538 So.2d 454 (Fla.1989), the Florida Supreme Court, upon certification from this court, addressed the question: *In Florida, must a compensatory damage award underlie a punitive damages award in a case in which the jury has made express findings against a defendant?* The Florida Supreme Court answered in the negative, holding that a jury finding of liability is equivalent to a finding of nominal damages and, consequently, the jury may assess punitive damages. *Id.*

In *Ad–Vantage I,* we relied on *Lassiter* to hold that nominal damages must be awarded to support an award of punitive damages. 849 F.2d at 1353; *see Sonson v. Nelson,* 357 So.2d 747 (Fla. 3d DCA), *cert. denied,* 364 So.2d 891 (Fla.1978) (the court held that *Lassiter* does not allow an award of punitive damages without at least nominal compensatory damages). *Ault* clearly holds otherwise. 538 So.2d at 455. To that extent, *Ault* departs from *Lassiter. Lassiter,* however, remains good law insofar as it holds that punitive damages do not have to be proportionally related to compensatory damages. *Ault,* 538 So.2d at 455; *see Miami Nat'l Bank v. Nunez,* 541 So.2d 1259, 1259 n. 1 (Fla. 3rd DCA), *review denied,* 553 So.2d 1165 (Fla.1989) (citing *Ault* and *Lassiter* for the proposition that a compensatory award may be remanded without the need to reexamine a punitive award).

As a final note, we are unpersuaded by GTEDC's procedural due process argument. We specifically affirmed "the jury's verdict finding GTEDC liable for tortiously interfering with Ad–Vantage's business relations." *Ad–Vantage I,* 849 F.2d at 1350. The punitive damage award does not unfairly, excessively, or arbitrarily punish GTEDC given the jury's finding of unlawful conduct. *See Gregg v. U.S. Indus., Inc.,* 887 F.2d 1462, 1477 (11th Cir.1989) (under Florida law, "[a] punitive damages award is considered excessive when the amount of damages is out of proportion to the degree of malice or wantonness of the defendant's conduct in relation to the defendant's financial worth").

Accordingly, we AFFIRM in part; REVERSE in part; and REMAND in part for

further proceedings consistent with this opinion.